481 So.2d 1357 (1985)
Ronald LaJAUNIE, et al.
v.
METROPOLITAN PROPERTY AND LIABILITY INSURANCE COMPANY.
No. 84 CA 1101.
Court of Appeal of Louisiana, First Circuit.
December 26, 1985.
*1358 James M. Funderburk, Duval, Funderburk, Sundbery & Lovell, Houma, for plaintiffs and appellees.
Henry Leon Sarpy, Porteous, Hainkel, Johnson & Sarpy, New Orleans, for defendant and appellant.
Before CARTER, SAVOIE and ALFORD, JJ.
CARTER, Judge.
We have carefully reviewed the record in this case and conclude that it contains no grounds for reversal or modification of the trial court's judgment. The record supports the findings and judgment of the trial court.
The trial court's treatment of strict liability under LSA-C.C. art. 2317, contributory and comparative negligence, and assumption of risk in strict liability cases is excellent. It is remarkable that the legal conclusions of the trial judge, who was without the benefit of the Louisiana Supreme Court's decision in Bell v. Jet Wheel Blast, Div. of Ervin Ind., 462 So.2d 166 (La.1985), are so consistent with this most recent pronouncement of the Supreme Court.
Therefore, for the reasons assigned by the Louisiana Supreme Court in Bell v. Jet Wheel Blast, Div. of Ervin Ind., supra, and by the trial judge in his written reasons for judgment, which we adopt as our own and attach hereto as "Appendix A," the judgment of the trial court is affirmed. Appellant is cast for all costs of this appeal.
AFFIRMED.

APPENDIX A

32ND JUDICIAL DISTRICT COURT

STATE OF LOUISIANA

PARISH OF TERREBONNE

NO. 72422

REASONS FOR JUDGMENT
This is a personal injury action brought by Ronald LaJaunie against Metropolitan Property and Liability Insurance Company who is the homeowner's insurer of Clifford and Patty Boquet, plaintiff's daughter and son in law. Mr. LaJaunie seeks damages as a result of injuries he sustained on March 27, 1983 when he fell from a tree located in the Boquets' yard. Plaintiff alleges that a decayed branch caused his fall and asserts that defendant is strictly liable for his damages.
The following issues are presented:
1) whether strict liability for plaintiff's damages should be imposed upon defendant under Civil Code Article 2317
2) If strict liability is imposed, whether defendant can raise the defense of contributory negligence in addition to assumption of the risk and, if so, whether defendant has proved either defense
3) If plaintiff was contributorily negligent, does his negligence completely bar his claim or do the principles of comparative negligence apply so as to merely reduce his recovery

FINDINGS OF FACT
Patty and Clifford Boquet, plaintiff's daughter and son in law, decided to cut down a tree located between their house and their neighbor's house in order to prevent the tree's roots from spreading and breaking their slab. They consulted a tree *1359 surgeon but felt that they could not afford his $300.00 fee. They then asked Mr. LaJaunie if he would cut it down for them. Mr. LaJaunie, who had never seen the tree before, agreed to do the job as a favor for the Boquets. He had had prior experience cutting down trees while employed by Texaco for ten years as a construction worker clearing right of ways for oil rigs. At the time he agreed to do the job, he was the operator of Taylor Rental Center so he had equipment on hand which he could use for the job. He brought from his store a chain saw, bow saw, an aluminum extension ladder and a rope. Upon his arrival at the Boquets' home he joined other family members, one of which was his son, Ronald LaJaunie, Jr., who assisted him with the job. Plaintiff, however, was in charge of and directed the operation.
The tree to be felled was a forty foot talley ball tree approximately two feet in diameter. It was situated three feet from the Boquet home and seven feet from the neighbor's house. The tree had many forks from which branches extended in different directions. Since some of the branches extended near the houses, Mr. LaJaunie decided to climb up into the tree and cut down these branches so they wouldn't strike the houses as the tree fell. The branches to be cut were approximately twenty to twenty-five feet high. Mr. LaJaunie did not inspect the tree for irregularities before starting the job. He and his son did discuss the possibility of his using a safety belt, but they both felt it would not be necessary. They set the extension ladder on top of the Boquet house, telescoped it, and leaned it on a fork in the tree. Mr. LaJaunie climbed into the tree while his son steadied the ladder.
Mr. LaJaunie began cutting branches in a section of the tree that faced the street. These branches were approximately six to eight inches in diameter. In order to cut the branches he would position himself in a fork of the tree. He would cut three-fourths of a branch, then tie it off with a rope which would be strung over a higher fork in the tree. He would then climb down out of the tree and pull down the branch. Mr. LaJaunie proceeded in this fashion for approximately two hours and cut about six or eight branches. During this time, they experienced no difficulty with the job. All of the branches cut appeared normal and healthy to Mr. LaJaunie and his son. Neither of them saw anything about the tree which would indicate that it was rotten or diseased in any way. When Mr. LaJaunie had finished cutting these branches in the section of the tree facing the street, he got out of the tree. He was getting ready to fell the tree when his son in law requested that he cut another branch toward the backyard side that was extending toward the neighbor's house. Mr. LaJaunie got up into the tree again. However, this time he went into the section of the tree facing the backyard side to cut the branch his son in law had requested that he cut. This branch was six to eight inches in diameter and was approximately twenty to twenty-five feet from the ground. Mr. LaJaunie used the same procedure to cut this branch as he had before. Positioning himself in a fork of the tree, he cut three-fourths into the branch with the bow saw and tied a rope onto it. When he finished cutting the branch he started to descend. He reached out with his left hand and grabbed a branch which was at chest level. The branch was three inches in diameter and about five to six feet long. He started to lower himself to the next fork three to four feet below and, as he did so. he put his full weight of 175 pounds on the three inch branch at a point one to two feet from the trunk of the tree. The branch broke instantly and Mr. LaJaunie fell twenty to tweny-five feet to the ground. Mr. LaJaunie had used that same branch to pull himself up to where he stood to cut the larger branch although he only put half of his weight on it while ascending. Prior to putting his weight on the branch, he did not test the branch to see if it could hold his weight. He only glanced at it. However, it appeared to him to have been a normal healthy branch and looked large enough to have held his weight.
*1360 The court finds that the branch which broke causing Mr. LaJaunie to fall was partially dead and further that, had the branch been healthy, it should have supported Mr. LaJaunie's full weight. This conclusion is supported by the testimony of Cleo Hebert, a tree surgeon who was employed by the Boquets to fell the tree after the accident, and Dr. Peter Fogg, a professor of forestry at Louisiana State University who testified regarding the mechanical properties of wood and the effect of stress upon particular types of wood.
Cleo Hebert, the tree surgeon, inspected the tree and found that it was dying of old age and root rot. He found root rot on the back side of the tree (the same side from which Mr. LaJaunie fell). Mr. Hebert climbed into the tree approximately fifteen feet from the top and noticed dead limbs at the top of the tree. He testified that the tree was rotting from the top and estimated that it had been sick for four to five years. Mr. Hebert finished cutting the branch that Mr. LaJaunie had partially cut prior to his fall which had been left in the tree with the rope still tied to it. He testified that Mr. Boquet had pointed out to him the location of the branch which had broken in Mr. LaJaunie's fall. Mr. Hebert testified that he inspected the nub left from the broken branch and concluded, from the appearance of the nub, that the branch, although not completely dead, was in the process of dying.
There was some inconsistency between the testimony of Mr. LaJaunie and Mr. Hebert raising the question whether the nub which Mr. Hebert examined and found to be partially dead was the same branch which broke causing Mr. LaJaunie's fall. However, this court believes that the inconsistency in their testimonies about the location of the broken branch in relation to the forks of the tree and the partially sawed branch left by Mr. LaJaunie was probably due either to Mr. Hebert's hazy recollection or to his being a bit confused by the questions posed by defense counsel on that subject. Therefore, this court finds, as a matter of fact, that the nub about which Mr. Hebert testified was the same branch which broke causing Mr. LaJaunie's accident.
Mr. Hebert further testified that, in his opinion, a normal healthy talley ball tree branch three inches in diameter would support about six times the weight of a 175 pound man. Although Mr. Hebert is not schooled in the scientific properties of the wood of a talley ball tree, this court believes that his fifteen years of experience in tree surgery qualified him to render such an opinion.
The opinion as to the weight bearing qualities of a healthy talley ball tree rendered by Mr. Hebert, based upon his years of experience, was substantiated by the testimony of Dr. Peter Fogg who was eminently qualified to render an opinion based upon scientific data. Dr. Fogg testified that a healthy talley ball tree branch three inches in diameter and six feet in length should support more than six times the weight of a 180 pound man exerted one to two feet from the base of the branch. Considering Mr. LaJaunie's testimony that the branch broke instantly when he put his full weight on it, Dr. Fogg concluded that the branch was not healthy. He explained that a quick break under stress indicates the wood has deteriorated because normal healthy wood under stress will bend first then a splintery break will occur.

CONCLUSIONS OF LAW
Plaintiff does not contend that Clifford and Patty Boquet were negligent in any respect. In any event, it is obvious from all of the evidence that no one knew or had reason to believe at the time of the accident that the tree was diseased. Therefore, plaintiff's only basis of recovery is a theory of strict liability (liability without negligence) based upon Civil Code Article 2317 and the jurisprudence interpreting that article.
Civil Code Article 2317 provides:
"We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or *1361 of the things which we have in our custody. This, however, is to be understood with the following modifications."
The principle of strict liability in this context was summarized by the Louisiana Supreme Court in Loescher v. Parr, 324 So.2d 441 (La.1975) where the court explained:
"When harm results from the conduct or defect of a person or thing which creates an unreasonable risk of harm to others, a person legally responsible under these code articles for the supervision, care, or guardianship of the person or thing may be held liable for the damage thus caused, despite the fact that no personal negligent act or inattention on the former's part is proved. The liability arises from his legal relationship to the person or thing whose conduct or defect creates an unreasonable risk of injuries to others.
"The fault of the person thus liable is based upon his failure to prevent the person or thing for whom he is responsible from causing such unreasonable risk of injury to others. Thus, the person to whom society allots the supervision, care, or guardianship (custody) of the risk-creating person or thing bears the loss resulting from creation of the risk, rather than some innocent third person harmed as a consequence of his failure to prevent the risk. His fault rests upon his failure to prevent the risk-creating harm and upon his obligation to guard against the condition or activity (by the person or thing for which he is responsible) which creates the unreasonable risk of harm to others."
The Louisiana Supreme Court, in Loescher v. Parr, supra, stated that in a strict liability case the plaintiff bears the burden to prove that the thing in defendant's custody has a vice posing an unreasonable risk of injury and that the plaintiff's damages resulted from the vice. Where the plaintiff has met his burden of proof the defendant can escape liability only if he shows the harm was caused by the fault of the victim, by the fault of a third person, or by an irresistable force. Aside from establishing that liability of an owner or custodian under Civil Code Article 2317 could be imposed without negligence on the defendant's part, the Supreme Court in, Loescher v. Parr, supra, held that a tree was a "thing" within the meaning of Civil Code Article 2317 so that an owner of a diseased tree could be liable for his legal fault in maintaining a defective tree.
In order to impose strict liability upon defendant, this court must first consider whether plaintiff has met his burden of proof. This court has concluded as a matter of fact that the Boquets' tree was diseased and that the branch which broke under Mr. LaJaunie's weight was decayed. Had the branch been healthy, it would have supported Mr. LaJaunie's weight therefore the cause of Mr. LaJaunie's fall was the fact that the branch was decayed. However, these conclusions alone are not sufficient to impose strict liability. This court must next examine whether the decayed condition of defendant's tree posed an unreasonable risk of injury. The Louisiana Supreme Court, in Entrevia v. Hood, [427] 426 So.2d 1146 (La.1983), pointed out that a defendant cannot be held responsible for all injuries resulting from any risk posed by the thing in his custody. He is only responsible for injuries caused by an unreasonable risk. Therefore, a thing may be defective in form and may still not pose an unreasonable risk of injury. In order to determine if a risk is unreasonable the court should use a balancing test similar to that used in negligence cases where the magnitude of the risk and the likelihood of harm is weighed against the cost or burden of preventing the risk and the social utility of the thing which caused the injury. The claims and interests of the respective parties should also be considered. Hunt v. City Stores, Inc., 387 So.2d 585 (La.1980); Kent v. Gulf States, 418 So.2d 493 (La. 1982); Entrevia v. Hood, supra. An important distinction must be made when employing this balancing test in strict liability cases as opposed to negligence cases. In negligence cases, the defendant's duty to take reasonable steps to prevent the harm arises because of his actual or constructive *1362 knowledge whereas in strict liability cases the owner's duty arises from his relationship to the thing and his responsibility for it. His actual or constructive knowledge of the risk is presumed. Kent v. Gulf States Utilities Co., supra. Therefore, employing the balancing test to determine if a risk is unreasonable, the court must first assume that defendant knew of the condition of the thing in his custody. Kent v. Gulf States Utilities Co., supra.
Considering first the claims and interests of the parties involved and the social utility of the activity involved, it is evident that the Boquets' interest in having plaintiff fell their tree was minimal. They wanted to save the $300.00 fee of a professional tree surgeon. Mr. LaJaunie, who sought to derive no benefit from his doing the job other then performing a favor for his daughter and son in law, had commendable interests at heart (unlike the trespasser in Entrevia v. Hood).
The likelihood of Mr. LaJaunie's suffering harm from climbing in a decayed tree without knowledge of its defective condition was significant and the gravity of harm resulting from a fall from a tree was great.
The cost or burden of preventing the risk in this case presuming, as we must, that the Boquets had knowledge of the condition of the tree, was slight. Had the Boquets known the tree was decayed they could have prevented the risk involved by simply paying for the services of a professional tree surgeon. Additionally, they could have discharged their burden of preventing an unreasonable risk by warning plaintiff of the tree's condition. Assuming that the Boquets' knew of the diseased condition of the tree, this court finds that they would have acted unreasonably in exposing Mr. LaJaunie to it.
Having concluded that plaintiff has met his burden to prove that the tree in the Boquets' custody had a vice or defect which posed an unreasonable risk of injury and that Mr. LaJaunie's injuries resulted from that vice or defect, the court must now consider whether defendant has met his burden of proof to establish a defense to the claim.
Defendant contends that the accident resulted from "victim fault". Victim fault has long been equated with assumption of the risk. Langlois v. Allied Chemical Corporation, 258 La. 1067, 249 So.2d 133 (1971). However, more recent decisions have recognized that contributory negligence can, in some cases, be considered "victim fault". Buchanan v. Tangipahoa Parish Police Jury 426 So.2d 720 (La.App. 1st Cir.1983); Carpenter v. State Farm Fire and Casualty Company, 411 So.2d 1206 (La.1982); Stewart v. Sam Wallace Indus. Co., 409 So.2d 335 (La.App. 1st Cir.1982), writ denied; Sullivan v. Gulf States Utilities, 382 So.2d 184 (La.App. 1st Cir.1980), writ denied 384 So.2d 447 (La. 1980). The Louisiana Supreme Court, in Dorry v. Lafleur, 399 So.2d 559 (La.1981), stated that the circumstances under which a plaintiff's contributory negligence should bar his recovery in a strict liability case should be developed on a case by case basis. It explained that, in cases where defendant's conduct is apparently innocuous or where the thing in defendant's custody is not ultrahazardous and produces no income to the defendant, there is no policy reason to deny these strictly liable defendants the defense of contributory negligence. This court finds no policy reasons which should prevent the application of the defense of contributory negligence in this case. The Boquets' tree was not ultrahazardous nor did it produce any income to the Boquets. Additionally, the Boquets', unlike a commercial enterprise which has the ability to pass the loss on to consumers, would be in a poor position to absorb the loss and redistribute it to the public. Therefore, this court finds that contributory negligence along with assumption of the risk both constitute proper defenses which defendant may assert in this case.
In order to establish the defense of assumption of the risk defendant must show that Mr. LaJaunie knew of the existence of the risk, appreciated its unreasonable *1363 character including the magnitude thereof, and that he voluntarily accepted that risk. The objective standardwhether plaintiff should have known of the riskis prohibited. There must be subjective knowledge of the risk on the part of the plaintiff. Dorry v. LaFleur, supra.
Mr. LaJaunie testified that the tree appeared to him to be normal and healthy in all respects. The court believes that Mr. LaJaunie did not know that the tree was decaying therefore had no subjective knowledge of the risk involved. Whether, under the circumstances, he should have known or discovered that the tree was diseased raises the issue of contributory negligence, not assumption of the risk. Therefore, this court finds that defendant has failed to establish the defense of assumption of the risk.
Next, the court must determine whether defendant has proven that Mr. LaJaunie was contributorily negligent. The court believes that Mr. LaJaunie was not unreasonable for undertaking the job because he had had prior experience felling trees. However, the court finds that he was negligent in failing to take adequate measures to protect himself from injury during the course of the job.
Mr. LaJaunie admitted that he thought about using a safety belt but decided not to use one. The court believes that Mr. LaJaunie should have realized that it would be dangerous to climb twenty to twenty-five feet up into a tree without some protection such as a safety belt. Additionally, the court finds that Mr. LaJaunie was negligent for failing to carefully test the branch before he put his entire weight on it. Mr. LaJaunie had enough experience in felling trees that he should have realized that sometimes the appearance of a tree branch can be deceptive. Since he had no equipment to prevent a fall should a branch break, the importance of carefully testing each branch before putting his weight on it should have been even more evident to him.
Having determined that plaintiff was guilty of contributory negligence, the court must determine if his contributory negligence completely bars his recovery or whether the adoption of comparative negligence principles in Louisiana mandates a comparision of plaintiff's negligence with defendant's fault resulting in a reduction of plaintiff's recovery proportionate to the degree of his negligence.
Civil Code Article 2323 was amended by Act No. 431 of the 1979 legislative session and was effective August 1, 1980. Civil Code Article 2323, as amended, provides:
When contributory negligence is applicable to a claim for damages, its effect shall be as follows: If a person suffers injury, death or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the claim for damages shall not thereby be defeated but the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death or loss.
The court has been referred to no cases which conclusively decide this issue. In Buchanan v. Tangipahoa Parish Police Jury, 426 So.2d 720 (La.App. 1st Cir.1983), the first circuit held that contributory negligence was victim fault under Civil Code Article 2317. In dicta, (the accident occurred prior to the effective date of the amendment to Article 2323 so contributory negligence was still the prevailing rule) the court commented:
With the advent of comparative negligence (perhaps comparative "fault" would be a better term), the harsh effect of the "all or nothing" contributory negligence rule will be substantially tempered. 426 So.2d at 726
A certification is pending in the Louisiana Supreme Court from the United States Court of Appeals for the Fifth Circuit in Bell v. Jet Wheel Blast, Inc., 709 F.2d 6 (5th Cir.1983); 717 F.2d 181 (5th Cir.1983) on the issue of whether the plaintiff's negligence in a strict liability claim arising in the context of a products liability case can be compared with the defendant's fault in *1364 order to reduce the plaintiff's recovery. However, no decision has yet been made.
The difficulty with the concept of comparing plaintiff's negligence in a strict liability case is that strict liability does not depend upon negligence on the defendant's part. Therefore, one would ask, "How can there be a comparison when defendant was not negligent?" This question can be resolved by examining the concept of "fault" as it is used in the Louisiana Civil Code. The Louisiana Supreme Court in Langlois v. Allied Chemical Corp., supra, explained that, although fault is not defined in the civil code, there are numerous standards of fault in the civil code and concluded that fault is not limited to moral wrongs. Legal fault envisioned by the Civil Code can arise because of certain types of activity such as that governed by Articles 2317, 2318, 2320, 2321 and 2322. The legal fault known as strict liability, imposed by these articles, does not depend on defendant's neglgence. However, the basis of this legal fault is derived from Civil Code Article 2315. The Louisiana Supreme Court recognized this idea in Loescher v. Parr, 324 So.2d 441 (La.1975) wherein it stated:
Articles 2315 through 2324 of the Louisiana Civil Code comprise the code's entire chapter of legal principle regulating offenses and quasi offenses.
The underlying principle is provided by Article 2315: "Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it. ---" The remaining articles constitute amplifications as to what constitutes "fault" and under what circumstances a defendant may be held liable for his act or that of a person or thing for which he is responsible.
The basis for imposing liability upon a defendant for his negligence is Civil Code Article 2316 which provides:
Every person is responsible for the damage he occasions not merely by his act, but his negligence, his imprudence, or his want of skill.
However, where a defendant is guilty of negligent conduct as envisioned by Civil Code Article 2316, he is likewise guilty of Article 2315 "fault." Therefore, regardless whether a defendant is liable because of his negligence or because of strict liability, he is guilty of "legal fault."
Civil Code Article 2323, mandating a comparison, speaks of plaintiff's "negligence" and defendant's "fault." It is significant that the legislature referred to defendant's conduct as "fault" rather than "negligence." The language implies a broader meaning to defendant's conduct encompassing any form of liability that can be considered "fault." This court therefore concludes that Article 2323 as amended in 1979 requires that plaintiff's negligence in a strict liability case be compared with defendant's fault and that, rather than completely barring plaintiff's claim, his damages should be reduced by the degree or percentage of his negligence.
The court assesses the respective fault of the parties at 65% fault on plaintiff's part and 35% fault on defendant's part. Therefore, plaintiff will be awarded 35% of his total damages.

DAMAGES
As a result of the accident, Mr. LaJaunie sustained a fracture of the left olecranon (point of the elbow), a fracture of the pelvis including a fracture of the sacrum and inferior and superior pubic rami, and a fracture of one of the transverse processes in the L-5 vertebra. He was hospitalized at Terrebonne General Hospital from March 27, 1983 to April 21, 1983 where he underwent surgery for an open reduction and internal fixation of the elbow with the insertion of two pins into the elbow to stabilize the bone fragments. His pelvic injury was complicated by a hematoma around the fracture which compressed the urethra causing him to be unable to urinate. Because of the urological complications, Mr. LaJaunie was catheterized for three weeks during which the prolonged catheterization caused bladder spasms and the constant urge to urinate. The compression of the urethra was resolved with catheterization and the bladder spasms treated *1365 with medication. By April 19, 1983, Mr. LaJaunie's urological problems had resolved leaving no permanent impairment.
Mr. LaJaunie was placed in traction for the pelvic injury. While in traction, Mr. LaJaunie had to lie flat and could not roll over or lift up. During this time, the pelvic injury caused him a considerable amount of pain. After his discharge from the hospital, Mr. LaJaunie was confined to his home for two months. During that time, he was confined to bed for two weeks, then spent one month in a wheelchair. By May 10, 1983, he was allowed to begin walking. He returned to the hospital in June for the removal of the pins from his elbow. During the course of his recovery one of the pins began to protrude from the skin and Mr. LaJaunie had to be treated with anti-infection medication. He received followup medical care for his elbow until July of 1983.
Due to the elbow injury, Mr. LaJaunie is permanently unable to fully extend his arm. Because of the lack of 15 degrees to full extension, Dr. Gary Guidry, plaintiff's treating physician, concluded that plaintiff has a 20% permanent impairment to the extremity and advises against any repetitive heavy lifting.
Dr. Guidry assessed no percentage for permanent impairment of the hip and leg resulting from the pelvic injury but testified that a 3/8 inch displacement of the pelvis has caused a slight leg length inequality resulting in a slight limp. Dr. Guidry, feels that this should not cause Mr. LaJaunie any significant degree of pain. However, heavy lifting or repetitive stooping may cause some discomfort.
Dr. Guidry testified that the fracture of the transverse process resulted in no permanent functional impairment. However, since evidence of this fracture will always appear on x-ray, Dr. Guidry stated that he would not recommend Mr. LaJaunie for employment in the oilfield industry or heavy labor industry.
Due to his injuries, Mr. LaJaunie missed three months of work. Counsel have stipulated that his lost wages during that time were $2,400.00 Counsel have further stipulated that Mr. LaJaunie's medical expenses incurred as a result of his injuries (after a credit for $1,000 paid under the medical payments provisions of defendant's policy) were $12,517.25.
Considering the evidence outlined above, this court finds that an appropriate award for Mr. LaJaunie's damages is as follows:

Mental and Physical Pain &
Suffering and Permanent
Disability (past & future) ------------$ 90,000.00
Medical Expenses ----------------------$ 12,517.25
Lost Wages ----------------------------$ 2,400.00
 ___________
 TOTAL DAMAGES ---------------------$104,917.25

These total damages must be reduced by the percentage attributable to plaintiff's contributory negligence. Since the court has found plaintiff 65% contributorily negligent, the total award due plaintiff is 35% of $104,099.25 or $36,721.04.