495 So.2d 1284 (1986)
Keith Patrick LANDRY
v.
The STATE of Louisiana and the Board of Levee Commissioners of the Orleans Levee District.
No. 86C0569.
Supreme Court of Louisiana.
October 20, 1986.
*1285 Lawrence Kullman, Nicholas Noriea, Jr., Samuel Gainsburgh, Kierr, Gainsburgh, Benjamin, Fallon & Lewis, New Orleans, for applicant.
Sylvia Landry, Wood Brown, Quentin F. Urquhart, Jr., Montgomery, Barnett, Brown & Read, New Orleans, for respondent.
COLE, Justice.
For the second time in this case, we must decide if the Orleans Levee Board should be excused from liability for injuries a recreational fisherman suffered when he fell trying to avoid a hole adjacent to the Lake Pontchartrain seawall in New Orleans.
In a previous decision, at 477 So.2d 672 (La.1985), we reversed the Court of Appeal, and held R.S. 9:2791 and 9:2795 do not confer immunity on the Levee Board for an injury to a fisherman on the board's lakefront property. The immunity the legislature meant to provide landowners for recreation activities does not extend, we concluded, to a recreational area within the state's largest urban center.
On remand, the Court of Appeal held the Levee Board was not liable under La.Civ. Code art. 2317, or on a negligence theory. The Court of Appeal found the trial court erred in concluding the hole, immediately adjacent to the seawall, was an unreasonable risk of harm. The appellate court concluded there was no unreasonable risk *1286 of harm when the social utility of the lakefront was weighed against the cost of preventing such accidents. 483 So.2d 162 (La. App. 4th Cir.1986). We granted writs to review the decision on strict liability. If we find the Levee Board strictly liable for the injuries, we must decide if the trial court erred in reducing the fisherman's recovery because of his comparative fault in causing the injury.
The Orleans Levee Board owns, operates and maintains approximately nine miles of seawall and related lakefront property along Lake Pontchartrain in the City of New Orleans. The seawall was built in 1929. It is open for use without charge and has parking bays, benches and tables along its length. The owner thus invites use of the lakefront by picknickers, walkers, joggers, fishermen and sunbathers.
Keith Patrick Landry went to the seawall about 8:00 A.M. on April 4, 1982, to fish for crabs. He was then 29, a lifelong resident of New Orleans and familiar with the lakefront because he had fished or visited the lakefront many times. He parked his car in a parking bay just a few yards from the seawall, walked across a grassy area and walked down the seawall's concrete steps to the water's edge. Landry fished for about 90 minutes, then retrieved his nets. He emptied his crabs into a hamper, placed his nets on top of the hamper and walked up the seawall. As he ascended the steps, Landry held the hamper and nets in front of his body, about chest-high, thereby blocking his vision to his feet. As he reached the seawall's top step, he saw out of his lateral vision the edge of a large hole adjacent to the seawall and immediately in his path. He attempted to step back from the hole and in doing so, lost his balance and fell down the seawall, injuring his knee.
Landry sought medical help later that day and was subsequently hospitalized for surgery to his knee. Two weeks later, he returned to the seawall accompanied by an attorney, who took pictures of the hole. The pictures show a hole partially obscured by thick, tall grass. The hole was flush to the seawall. David Warner said when he took the pictures in April 1982, the hole was approximately three feet long and half as wide. Warner returned to the area in June 1982, to take more pictures, but he found the entire area graded over and the hole filled with dirt. Landry remembered the hole as about eight inches deep, but smaller in length and width than Warner's description. He said the hole contained debris that appeared left from a barbecue. Both Landry and Warner said the hole was not apparent from a distance. They said the hole was visible to someone ascending the seawall only when standing on the top step.
The trial court dismissed the State of Louisiana as a defendant on a motion for summary judgment. It found the Levee Board strictly liable for Landry's injury. The court said the lakefront area is a recreational area and visitors are invited to use it. "The presence of the hole presented an unreasonable risk of harm to people in plaintiff's position."
On remand from this Court, the Court of Appeal held the trial court was not clearly wrong in concluding there was a hole adjacent to the lakefront seawall and Landry's injury occurred when he attempted to avoid the hole. The trial court erred, the appellate panel found, by failing to weigh the risk of harm against the social utility of the area and the cost of preventing such accidents. Factually, the appeal court noted several things. The hole which caused plaintiff to fall was caused by wave action and erosion along the seawall. The holes and depressions occur with great regularity and the Levee Board would be extremely burdened if it were made to prevent the appearance of such holes or to detect and fill them daily. Strict liability for holes caused by natural wave action and erosion would force the levee Board to hire more personnel and conduct daily inspections before the lakefront could be opened to the public.
*1287 The Court of Appeal recognized the case posed the difficult issue of determining the existence of an unreasonable risk of harm. The court said this Court's discussion of strict liability in Entrevia v. Hood, 427 So.2d 1146 (La.1983), and cases following Entrevia, left it convinced that each case must be decided on its own facts. Since the lakefront is an area of great social utility, since erosion and deterioration of the lakefront are caused by nature and because detection and correction of such defects would place a costly burden on the Levee Board, the risk of harm created by the hole which injured Landry was not unreasonable, the court concluded.
Our review of this decision begins with the requirements of strict liability. Civil Code art. 2317 reads: "We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of things which we have in our custody. This, however, is to be understood with the following modifications." Articles 2318-2324 set out the modifications.
In Loescher v. Parr, 324 So.2d 441 (La.1975), this Court analyzed the elements of recovery under 2317: the plaintiff must prove (a) that the thing which caused the damage was in the care (custody) of the defendant owner, (b) the existence of a defect or vice of the thing and (c) that his damage occurred through this defect or vice. The owner-guardian of the defective thing is liable for his legal fault in maintaining the defective thing and preventing its vice from causing injury, unless he proves that the damage was caused by the fault of the victim, by the fault of a third person, or by an irresistible force.
Entrevia v. Hood, supra, applied article 2317 and Loescher's teachings to a defect in a building. Entrevia stated in order to recover in strict liability against the owner of a building, the injured person must prove the building, or its appurtenances "posed an unreasonable risk of injury to others," and that his damage occurred because of this risk. "The owner is absolved from his strict liability neither by his ignorance of the condition of the building, nor by circumstances that the defect could not easily be detected." Entrevia, p. 1148.
The Court, in Entrevia, said there is a limit on the owner's strict liability. The owner can not be held responsible for all injuries resulting from any risk posed by his building or thing, only those caused by an unreasonable risk of harm to others. Entrevia then explained: (p. 1149)
The unreasonable risk of harm criterion, however, is not a simple rule of law which may be applied mechanically to the facts of a case. It is a concept employed by this court to symbolize the judicial process required by the civil code. Since Articles 2317 and 2322 state general precepts and not detailed rules for all concrete cases, it becomes the interpreter's duty to decide which risks are encompassed by the codal obligations from the standpoint of justice and social utility.
The Entrevia court said the application of strict liability must follow a weighing of moral, social and economic values and the ideal of justice.
... As this court has noted in relation to other forms of strict liability under the civil code, the activities of man for which he may be liable without acting negligently are to be determined after a study of the law and customs, a balancing of claims and interests, a weighing of the risk and the gravity of harm, and a consideration of individual and societal rights and obligations. Langlois v. Allied Chemical Corporation, 258 La. 1067, 1084, 249 So.2d 133, 140 (1971).
In deciding the defect in Entrevia's circumstances did not pose an unreasonable risk of harm, the court weighed the evidence in the record. It found the plaintiff was on the premises as a trespasser; the plaintiff's conduct was thus morally and legally reprehensible. The building was isolated, unproductive, rural property. The property had little worth or utility at the time of the accident and its owner was in a poor position to absorb the costs of premises' risk and redistribute the costs to the community. There was no social or economic *1288 good to be achieved in imposing a burden which would require total destruction or high level restoration of an obsolescent farm building. The vice in the property was the rear steps, but the building was remotely located behind a fence which plainly warned against trespassing. The magnitude of the risk posed and the gravity of harm threatened were small when weighed against other risks presented by things in our society.
The facts and circumstances of the case before us pose an interesting contrast to Entrevia. The defect was a hole partially obscured by grass and located immediately beside the seawall in a spot where anyone stepping off the seawall would place their foot. The hole was located along lakefront property in the state's largest urban center. The lakefront has, since its opening, served as a recreation area which invites use by residents and tourists. A residential section is located across Lakeshore Drive from the area of plaintiff's fall. The plaintiff was a recreational fisherman engaged in conduct which he had every legal right to pursue. He was engaged in recreation which thousands of persons pursue along the same lakefront. The owner is a public body with taxing authority. The cost of any burden imposed by strict liability can be spread widely among the persons who enjoy the recreational pleasures of the lakefront. The potential for harm is great because the area is heavily used at all hours by adults and children. This particular defect is located in a spot where foot traffic would probably be frequent. The cost of prevention will not be substantial; a barricade will suffice to warn of the danger until the hole can be filled.
We agree with the Court of Appeal in its finding that the hole which caused the injury to plaintiff and other holes along the seawall are the normal consequences of wave action and erosion. There was ample evidence the forces of the steady waves and tides pounding the seawall, compounded by severe weather striking the lakefront, account for holes all along the seawall. We also agree the lakefront area's social utility needs no emphasis; it is a widely used recreational area with conveniences which invite public use.
However, we disagree with a finding this hole does not present an unreasonable risk of harm and the conclusion it would be unreasonable to require the Levee Board to correct holes which pose threats to persons using the seawall.
Our review of the record disclosed no evidence was presented to confirm the argument that the costs of repair or frequent inspections would be an undue burden on the Levee Board. On the contrary, there was evidence of the Levee Board's existing efforts to clean up after severe weather and to keep the lakefront and seawall in good repair. The Levee Board presented a log which showed a seven-month period of periodic clean-up or grading and filling along the seawall in the aftermath of severe weather. Given the board's existing maintenance efforts, the cost of filling holes such as the one which injured plaintiff does not seem a burden when weighed against the risk of harm presented by holes in an area where recreational use occurs daily, and the number of people present is large and their activities varied.
Having found the plaintiff established a strict liability case, and finding the hole presented an unreasonable risk of harm, we hold the Levee Board is liable for this defect which caused plaintiff's injury.
We now review the trial court's decision that comparative fault should apply to this strict liability case and result in a reduction of plaintiff's recovery.
The trial court judge in this case, as a justice ad hoc, was the author of this Court's plurality opinion in Dorry v. LaFleur, 399 So.2d 559 (La.1981). The judge said his opinion in Dorry and his opinion in this case were that contributory negligence should be a defense in some strict liability cases.
The Court of Appeal did not reach the comparative fault issue in either opinion. Since we reinstate the trial judge's decision of strict liability, we address the issue of comparative fault.
*1289 This accident occurred on April 4, 1982. Current Civil Code article 2323 was adopted by Acts 1979, No. 431, and was in effect, providing for the application of comparative fault. It provides:
When contributory negligence is applicable to a claim for damages, its effect shall be as follows: If a person suffers injury, death or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the claim for damages shall not thereby be defeated, but the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death or loss.
This Court has begun to apply comparative fault in strict liability cases.
In Entrevia, at Fn. 1, 427 So.2d 1146, at 1148, it was noted:
The damage amount can at times be reduced according to the circumstances, such as imprudence on the part of the victim. Article 2323 (as in effect on the date of the instant accident). See also, new Article 2323 (Amended Act 431, § 1, 1979) which provides for the application of comparative negligence as a "modification" of Article 2317.
In Bell v. Jet Wheel Blast, Division of Ervin Industries, 462 So.2d 166, 171 (La. 1985), we answered a certified question, deciding that comparative fault may be applied in some strict products liability situations.
On the other hand, pure comparative fault principles would seem to coincide with and further the goals of products liability doctrine in some cases. Where the threat of a reduction in recovery will provide consumers with an incentive to use a product carefully, without exacting an inordinate sacrifice of other interests, comparative principles should be applied for the sake of accident prevention.
In obvious anticipation of more strict liability cases in which comparative negligence would apply, the Court said in Bell: (at p. 172)
... [T]he question of whether other classes of cases fall within the category to which comparative fault may apply must be decided on a case-by-case basis.
The later case of Turner v. New Orleans Public Service Inc., 471 So.2d 709 (La. 1985), held that the comparative fault doctrine would thereafter apply to motorist-pedestrian cases. The Court resisted the application of comparative fault in all cases arising since new article 2323 was adopted. The Court said, "Care should be taken, however, to note that we do not hold that the victim's fault shall always reduce his compensation." (at p. 714)
The intermediate courts, especially in the wake of Bell v. Jet Wheel Blast, supra, have begun to consistently decide comparative fault is a defense in strict liability cases and may be applied to reduce plaintiff's recovery.
In LaJaunie v. Metropolitan Property and Liability Insurance Company, 481 So.2d 1357 (La.App. 1st Cir.1985), the plaintiff's injury was caused by a diseased tree limb. The Court of Appeal adopted the trial court's reasoning, which noted article 2323 spoke of plaintiff's negligence and defendant's fault. The language of the statute implies a broader meaning to defendant's conduct, encompassing "any form of liability that can be considered `fault'," the court said. Article 2323 therefore "requires that plaintiff's negligence in a strict liability case be compared with defendant's fault...." 481 So.2d at 1364.
The doctrine of comparative fault was applied in the strict liability case of Harper v. State Farm Mutual Automobile Insurance Company, 484 So.2d 737 (La.App. 1st Cir.1986), writ den., 489 So.2d 246 (La. 1986). Harper's holding relied on Bell v. Jet Wheel Blast, supra, and a use of comparative fault in a highway defect case, Holmes v. State of Louisiana Through Department of Transportation, 466 So.2d 811 (La.App. 3d Cir.1985), writs den., 472 So.2d 31 (La.1985). Holmes found a highway shoulder with a deep rut presented an unreasonable risk of harm to a motorist who strayed off the highway onto the shoulder. The court applied a duty-risk analysis and found the state's duty did not *1290 extend to a motorist who strayed off the paved highway because his abilities were impaired by his intoxication. The Holmes court used the Bell analysis to apply comparative fault. The reduction of the plaintiff's award would act as an incentive for motorists to operate their vehicles more safely, the court said, while the reduction of plaintiff's award would not lessen the incentive of the state highway department to maintain reasonably safe highways and shoulders.
A recent example of the application of comparative fault in a highway defect case is Motton v. Travelers Insurance Co., 484 So.2d 816 (La.App. 1st Cir.1986). The Court of Appeal followed Turner, concluding it is wise to "provide the State with an economic incentive to maintain highway shoulders in a safe condition and to place liability upon the State, whose conduct created a far greater risk of harm to others than did the motorist's conduct. Like the court in Turner, we believe these legitimate interests can now be accomplished by the application of comparative fault, which has the additional advantage of achieving a more equitable result, with each party bearing the burden of its proportionate degree of fault." 484 So.2d at 822.
The First Circuit considered the application of comparative fault in a strict liability case involving a defective sidewalk on a university campus. Carter v. Board of Supervisors of Louisiana State University, 459 So.2d 1263 (La.App. 1st Cir.1984), writs denied, 462 So.2d 1248 (La.1985). A portion of a sidewalk on the Baton Rouge campus had sunk about two and one-half inches. A pedestrian carrying packages in her arms tripped on the irregular surface. The defect created an unreasonable risk of harm to campus visitors, the court held. The court rejected a reduction of recovery in this case because it found no fault by the plaintiff.
In Wood v. Cambridge Mutual Fire Insurance Co., 486 So.2d 1129 (La.App. 2d Cir.1986), the fault of the plaintiff was found the sole cause of a trip-and-fall accident. The plaintiff sued his landlord following his fall in a depression caused by a rotting tree stump. The court said a reasonably observant person would have seen the hole and avoided it, therefore no duty was owed the plaintiff who had lived at the residence for over a year and had ample opportunity to observe the hole. There was no unreasonable risk of injury in the circumstances.
As our review of this sampling of recent jurisprudence shows, comparative fault is being applied in settings of sidewalk and yard defects, highway defects and other strict liability cases. The courts are applying the comparative fault principles to strict liability cases on a case by case basis and as the facts and circumstances lead the courts to do so. We deem this proper at this time. In many cases, the courts follow the reasoning of Bell, supra, and inquire whether reducing the negligent plaintiff's recovery would serve as an incentive for similarly situated plaintiffs to exercise care, while not reducing the incentive of the owner of the thing from removing a risk of harm.
This is such a case. Our application of comparative fault will reduce plaintiff's recovery and thereby give similarly situated plaintiffs a motivation for exercising reasonable care in the circumstances. A reduction of plaintiff's recovery will not diminish the defendant-owner's incentive to remove unreasonable risks from his property.
As we noted in our previous opinion in this case, the Legislature has recently acted to limit the liability of the State and its political subdivisions for things which they own. Act 454 of 1985 (R.S. 9:2800) greatly limits the liability of the State and its political subdivisions as regards liability under La.Civil Code art. 2317. Since the statute changes the substantive law of Louisiana it applies prospectively. This case arose before the statute became effective, therefore the law is not relevant to our consideration.
We find, as did the trial court, the plaintiff was partially at fault for his fall. He testified he carried his hamper of crabs and his fishing gear in front of his body, obscuring his view of his feet. He thus prevented *1291 himself from spotting the hole earlier and saving himself from falling. Plaintiff had visited the lakefront area many times during his years of residence in the city. He had to notice the lakefront seawall required a high degree of care in ascending and descending, and that holes and depressions appeared due to the natural erosion of wind and water. The seawall in many places, the testimony showed, is half a foot higher than the grassy area adjacent to it, therefore a step up or down is necessitated.
The court assigned two-thirds of the fault to plaintiff and one-third to defendant. We will not disturb this factual decision, finding no manifest error in our review.

DECREE
For the reasons assigned above, we reverse the Court of Appeal and reinstate the trial court judgment for plaintiff. REVERSED. TRIAL COURT JUDGMENT REINSTATED.
DENNIS, J., concurs with reasons.
LEMMON, J., dissents and will assign reasons.