506 So.2d 888 (1987)
Huey J. BARBIN on Behalf of his Minor Son Carey G. BARBIN
v.
STATE of Louisiana, et al.
No. 86 CA 0260.
Court of Appeal of Louisiana, First Circuit.
April 14, 1987.
Rehearing Denied May 11, 1987.
*889 C.F. Duchein, III, Baton Rouge, for plaintiff-appellee Huey J. Barbin on behalf of his Minor Son, Carey G. Barbin.
Donald T.W. Phelps, Baton Rouge, for defendant-first appellant and third party plaintiff Leo Burke and Horace Mann Ins.
R. Bruce MacMurdo, Baton Rouge, for defendant-second appellant State of La. through Dept. of Education; State Bd. of Elementary Secondary Education and Louisiana School for the Deaf.
Before SAVOIE, CRAIN and JOHN S. COVINGTON, JJ.
CRAIN, Judge.
On March 17, 1981, Carey G. Barbin suffered personal injuries as the result of an accident which occurred while participating in a woodworking class in which he was enrolled at the Louisiana School for the Deaf. Carey was twelve years old at the time of the accident and has been deaf and mute since birth. Under the supervision of Leo Burke, the woodworking instructor, *890 Carey proceeded to operate a table saw without the use of the safety guard. His right index finger came into contact with the blade, resulting in a longitudinal cut from the tip of his finger into the proximal interphalangeal joint.
This action was instituted by Huey J. Barbin on his own behalf and on behalf of his minor son, Carey Barbin. Named defendants are Burke, the Louisiana School for the Deaf, and the State of Louisiana through the Department of Education, State Board of Elementary and Secondary Education.
The state instituted a third party action against Rockwell International Corporation, manufacturer of the saw, alleging that the blade guard or safety guard was poorly designed. Rockwell filed a motion for summary judgment which was granted by the trial court and affirmed by this court. Huey J. Barbin v. State of Louisiana, et al, No. 83 CA 0349, slip op. (La. App. 1st Cir. Feb. 28, 1984) The state instituted a third party action against Horace Mann Insurance Company, Burke's insurer, for indemnity or contribution should the state be held liable to plaintiff. Horace Mann and Burke instituted a third party action against the state seeking indemnity or contribution under La.R.S. 13:5108.2 should they be held liable to Barbin.
After trial on the merits judgment was rendered in favor of Huey J. Barbin personally in the sum of $5,752.10 and on behalf of Carey Barbin against Burke and the State of Louisiana through the Board of Elementary and Secondary Education, in solido in the sum of $185,000. Judgment was rendered, sustaining the exception of no cause of action to the third party demand filed by Horace Mann and Burke. The state's third party demand for indemnity against Horace Mann was granted up to the policy limit of $500,000.
From this judgment, Horace Mann and Burke appeal alleging several assignments of error.

NEGLIGENCE OF BURKE
In the first assignment of error appellants allege that the trial court erred in finding Burke liable for Carey's injuries.
The following facts are uncontested: With the safety guard in place it was virtually impossible for the operator's fingers to come into contact with the blade. The safety guard had not properly functioned since 1979. Use of the saw with the malfunctioning safety guard in place exposed the operator to the potential danger that the safety guard might come into contact with the blade and forcefully push the item being sawed back at the operator. Burke was not authorized to procure a new safety guard and he was unable to repair the defective one. He orally notified the appropriate school authority, Mr. Estes, that the safety guard malfunctioned. No action was taken by the school authorities to repair or procure a new safety guard, nor did the school authorities act in any manner to prevent use of the saw without the safety guard by Burke or any of his students. The school rules prohibited use of the saw by seventh and eighth graders (Carey was in seventh grade at the time of the accident) and prior to the accident the school officials were unaware that seventh and eighth graders used the saw. Use of the saw without the safety guard in place was in contravention of the safety procedures recommended by the manufacturer. It was also a violation of the posted shop rules. The students received adequate safety and operating instructions from Burke.
At the time of the accident, Carey received permission from Burke to operate the saw. Both Carey and Burke were aware that the saw was to be operated without the safety guard in place. Indeed, the saw had never been operated with the safety guard during the entire time that Carey was enrolled in Burke's woodworking class.
At the time of the accident, Burke was positioned immediately in front of the saw facing Carey in order to supervise Carey's operation of the saw. Another student approached and tapped Burke on the shoulder. Burke turned his head. This movement distracted Carey, who instinctively *891 looked up and while looking up cut his finger on the blade.
"A teacher has the duty to conduct his classes so as not to expose his students to an unreasonable risk of injury." Green v. Orleans Parish School Board, 365 So.2d 834, 836 (La.App. 4th Cir.1978), writ refused, 367 So.2d 393 (La.1979). The use of the saw by a twelve year old student without the safety guard in place is inherently dangerous and created an unreasonable risk of injury to the student. The type of injury which Carey suffered is within the scope of the risk which the duty is designed to prevent. Burke was aware of the potential dangers of using the saw without the guard and allowed Carey to use it anyway.
Accordingly, we conclude that the trial court correctly determined that Burke was negligent.

NEGLIGENCE OF CAREY
In the second assignment of error appellants allege as error the trial court's failure to find that Carey was negligent and that his negligence contributed to his injury. The actions of a twelve year old child "must be judged by his maturity and capacity to evaluate circumstances in each particular case, and he must exercise only the care expected of his age, intelligence, and experience." Ryle v. Potter, 413 So.2d 649, 651 (La.App. 1st Cir.1982).
It is uncontroverted that Carey is bright and a high achiever scholastically. However, Carey was twelve years old at the time of the accident. He was aware that the appropriate method to operate the saw was with the safety guard in place, but Burke was Carey's instructor. Carey was working on a class project. The saw was regularly used in the classroom without the safety guard with the permission of and under the supervision of Burke. A twelve year old, no matter how precocious, can hardly be expected to demand of his instructor that the saw be used only with the guard in place. Additionally, it is uncontested that Carey proceeded to use the saw in an appropriate manner. Carey's accident was caused by momentary inattention when he glanced up at his instructor after having observed with his peripheral vision a sudden movement of the instructor's head.
The trial court found that Carey was not negligent. After reviewing the record we conclude that it supports the trial court's determination.

FAULT OF THE STATE
In order to decrease percentage of fault on the part of Burke for purposes of contribution, Burke and Horace Mann argue fault on the part of the state independent of the negligence of Burke. The theory of independent fault is three fold: the state is strictly liable as the custodian of a defective thing; the state is independently at fault through negligence in knowingly allowing an unreasonably dangerous condition to exist, the protracted operation of the saw without a guard; the state is at fault through the doctrine of respondeat superior for negligence of employees other than Burke.

1) STRICT LIABILITY-CUSTODIAN OF A DEFECTIVE THING
In considering a summary judgment granted in favor of Rockwell International for manufacturing this saw with a defective guard we affirmed that judgment in an unpublished opinion where we stated:
[T]he facts of this case show that the guard was not in place at the time of the accident. In fact the guard had been removed and not in use for a year prior to the accident. This fact destroys the defect in the guard as the predisposing cause.
Barbin, No. 83 CA 0349 at 3.
Thus, even though the guard may have been defective we have previously held that the defective guard did not cause the accident. However, for purposes of strict liability the owner or custodian of a thing (the state) is strictly liable if the plaintiff proves that under the circumstances the thing presented an unreasonable risk of injury which resulted in the damage. Kent v. Gulf States Utilities Co., 418 So.2d 493 (La.1982). We find that to be the *892 case here. The testimony is consistent that operation of this saw without the guard created an unreasonable risk of injury to the user.
The distinction between analyzing liability based on negligence and liability based on maintaining custody of a defective thing is that in the latter instance it is not necessary to prove knowledge of the dangerous condition. Kent, 418 So.2d at 497. Consequently, the state is liable for maintaining custody of a saw defective in the manner used because it created an unreasonable risk of injury to the user.
Having determined the state is at fault as to custody of a defective saw it is unnecessary for us to consider whether the state might also have been at fault because of negligence in allowing use of the saw while knowing the use was unreasonably dangerous. It is also unnecessary to determine the fault of the state because of negligence of state employees other than Burke. The remaining question is whether the state's fault based on strict liability is comparable to the fault of Burke based on negligence, and if so the percentages attributable to each.
Commentators and the courts have distinguished among the types of strict liability: strict liability for ultrahazardous activities, strict products liability, and strict liability under the "responsibility" articles (La.C.C. arts. 2317-2322). E.g., Kent, 418 So.2d 493; Note, Contributing NegligenceWhen Should It Be a Defense in a Strict Liability Action?, 43 La.L.Rev. 801 (1983). The strict liability to which we refer in this case is based on the "relationship" articles.
There is no sufficient policy reason which would justify prohibiting comparing fault between a plaintiff and a strictly liable defendant. Plant, Comparative Negligence and Strict Tort Liability, 40 La.L. Rev. 403 (1980). The fault of a strictly liable defendant arises from the defendant's legal relationship to the person or thing creating an unreasonable risk of harm to others. Loescher v. Parr, 324 So.2d 441 (La.1975). Legal fault under La. C.C. art. 2317 is not dependent on negligence. However, legal fault under La.C.C. art. 2315 encompasses negligence as well as strict liability. LaJaunie v. Metropolitan Property and Liability Insurance Co., 481 So.2d 1357 (La.App. 1st Cir.1985). It would thus be inequitable to allow fault to be compared between a plaintiff whose fault contributed to the damage and a negligent defendant, and to disallow comparative fault between that plaintiff and a defendant who is not negligent but is liable due to his legal relationship with the defective thing. See Dorry v. Lafleur, 399 So.2d 559 (La.1980); Harper v. State Farm Mutual Automobile Insurance Co., 484 So.2d 737 (La.App. 1st Cir.), writ denied, 489 So.2d 246 (La.1986); LaJaunie, 481 So.2d 1357; Buchanan v. Tangipahoa Parish Police Jury, 426 So.2d 720 (La.App. 1st Cir.1983); Sullivan v. Gulf State Utilities Co., 382 So.2d 184 (La.App. 1st Cir.), writ denied, 384 So.2d 447 (La.1980).
In Bell v. Jet Wheel Blast, Division of Ervin Industries, 462 So.2d 166 (La. 1985) the Louisiana Supreme Court held that comparative fault may be applied in strict products liability cases on a case by case basis. This court has applied Bell v. Jet Wheel Blast by analogy to a defendant who is strictly liable due to the defendant's legal relationship with a defective or unreasonably dangerous thing. Harper, 484 So.2d 737; LaJaunie, 481 So.2d 1357. Accordingly, we hold that comparative fault principles apply to strict liability.
The adoption of comparative negligence by 1979 La.Acts. 431 has resulted in major changes in the framework for loss apportionment in multiple party litigation which includes restructuring of the contribution rights of defendants to reflect their proportionate fault as well as the fault, if any, of the plaintiff. Chamallas, Comparative Fault and Multiple Party Litigation in Louisiana: A Sampling of the Problems, 40 La.L.Rev. 373 (1980); Pearson Apportionment of Losses Under Comparative Fault LawsAn Analysis of the Alternatives, 40 La.L.Rev. 343 (1980). Former La. C.C. art. 2103 was amended by 1979 La. Acts 431 to provide that when an obligation owed by solidary obligors "arises from an *893 offense or a quasi-offense, it shall be divided in proportion to each debtor's fault." Former La.C.C. art. 2103 was vacated by 1984 La.Acts 331, § 1 and this subject matter is now contained in La.C.C. art. 1804. The official comment (b) of La.C.C. art. 1804 provides that when the obligation arises from an offense the virile portion of each obligor is in proportion to his fault, "which is consistent with the idea of comparative negligence."
The same general principle applies to both comparative negligence and comparative contribution, liability is based on proportionate fault. Chamallas, Comparative Fault and Multiple Party Litigation in Louisiana: A Sampling of the Problems, 40 La.L.Rev. at 375-376. If comparative negligence applies in strict liability cases then fault should be compared not only between the plaintiff whose fault contributed to the damages and a strictly liable defendant, fault should also be compared between a strictly liable defendant and a negligent defendant. Thus, in keeping with the legislative mandate of comparative fault and comparative contribution we hold that the fault of a strictly liable defendant should be compared with the fault of a negligent defendant, regardless of the fault, if any, of plaintiff.
Fault should be apportioned according to the "nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed." Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967, 974 (La.1985) (quoting section 2[b] of the Uniform Comparative Fault Act).
The state is strictly liable as the custodian of the saw which was stored and used in a classroom by students. Burke was aware of the dangerous propensity of the saw when used without the safety guard; that its operation was in violation of the safety rules promulgated for his department; and that the manufacturer warned against using the saw in this manner. Although the state had not fulfilled its duty to the students by repairing the safety guard or purchasing a new one, Burke knowingly authorized his students to use the saw in this dangerous manner.
After weighing the above factors we apportion 80% of the fault to Burke and 20% to the state.

INDEMNITY

a) INDEMNITY OF BURKE AND HORACE MANN
In the fourth assignment of error appellants allege that the trial court erred in determining that appellants were not entitled to indemnity from the state.
Burke is a state employee as defined in La.R.S. 13:5108.2 A(1). La.R.S. 13:5108.2 B provides that "the state shall hold harmless and indemnify each official, officer, and employee of the state from any financial loss ... arising out of any claim, demand, suit, or judgment in any court by reason of alleged negligence" of the employee acting within the course and scope of his employment. (Emphasis ours). La.R.S. 13:5108.2 F provides "[I]f an official, officer, or employee of the state is held liable for monetary damages for actions arising under the circumstances provided by this Section, the legislature shall appropriate a sum sufficient to reimburse the official, officer, or employee." (Emphasis ours). The rights and obligations of any insurer shall not be modified, impaired or limited by La.R.S. 13:5108.2. La.R.S. 13:5108.2 H. The statute further provides that the benefits of La.R.S. 13:5108.2 "shall inure only to officials, officers, employees of the state ... which ... shall not enlarge or diminish the rights of any other party." La.R.S. 13:5108.2 I.
The statutory language is unambiguous. From a clear reading of the statute it is apparent that the legislature intended that the state indemnify officials, officers, or employees of the state for financial losses incurred as a result of judicial action instituted against the employee. The sum of the damages awarded was within the limits of Burke's liability insurance policy. Burke has not suffered a financial loss, thus Burke is not entitled to indemnity from the state. Horace Mann is an insurer, *894 not a state employee, therefore, La.R.S. 13:5108.2 is inapplicable to Horace Mann.

b) INDEMNITY OF THE STATE
When an employer's liability is derivative and imposed by law for the negligence of its employee, the general rule is that the employer is entitled to indemnity from the employee. La.C.C. art. 1804; see Thomas v. W & W Clarklift, Inc., 444 So.2d 1300 (La.App. 4th Cir.), writ denied, 448 So.2d 113 (La.1984). Consequently, we must consider the right of the state as the employer of Burke to indemnity from Burke for the 80% fault attributable to Burke.[1] Appellants contend that this general rule is inapplicable because of La.R.S. 9:3921. This statute provides that a derivatively liable employer is not entitled to indemnity or contribution from the primarily liable employee. However, its application is limited to occasions where the employee has entered into a transaction or compromise or conventional discharge with the damaged creditor. It is not applicable in this case because neither Burke nor Horace Mann have entered into a transaction or compromise or conventional discharge with plaintiff. Consequently, the state is entitled to indemnity for the 80% of its liability attributable to the negligence of Burke.

QUANTUM
In the fifth assignment of error appellants allege that the trial court abused its discretion in assessing damages.
Carey suffered a longitudinal cut from the fingertip into the proximal interphalangial joint (middle joint) of the right index finger. He was treated initially by Dr. Jack Loupe, orthopedist. He was next seen by Dr. Kenneth Cranor, orthopedist, for follow up care on May 4, 1981. At that time Carey had 15 to 45 degrees passive motion and 10 degrees active motion in the proximal interphalangial joint. Active motion is the motion caused by the tendons which go into the hand and passive motion is the ability to move the joint manually. Carey was required at that time to use a splint at night and exercise the finger during the day. On July 15, 1981, Carey underwent surgery for an attempted reconstruction of the joint in order to compensate for loss of bone. The surgery was accomplished by grafting bone taken from the iliac crest to the finger. A tendon graft was performed in April, 1982, in order to improve the active extension of the finger. At present Carey has a radial deviation of the affected joint at 12 degrees and a range of motion from the position of 10 degrees to the position of 30 degrees.
Dr. Cranor stated that the angular deviation may perhaps be improved or corrected by future surgery which would consist of the construction of an artificial joint. However, the long term prognosis for the artificial joint is a decrease in function in the joint. Without surgery, the angular deviation will more than likely increase. Carey's permanent impairment was assessed by Dr. Cranor at 58% of the finger and 15% of the hand. Dr. Cranor was unable to make a determination of disability in reference to Carey's communication skills. He stated that Carey is at an increased risk for further injury due to lack of motor control of the finger and its awkward position, therefore, Carey's participation in sports and daily physical activities should be limited. Additionally, the finger is now sensitive to the cold.
Carey's finger remains disfigured. In addition to normal uses of the finger, Carey must use his finger whenever he communicates with another person and it is always highly visible when he does so.
Carey's use of the finger is permanently impaired. Deaf persons communicate primarily by sign language, finger spelling or a combination of both. The finger impairment has not affected his signing skills. However, it has permanently affected his finger spelling skills. He is unable to form approximately twelve letters of the twenty-six letter alphabet. This impairment is comparable to a speech impediment. Various witnesses compared the impairment to a harelip or cleft palate, speaking with a *895 lisp, or speaking with an almost unintelligible accent.
Finger spelling is the primary mode of communication for deaf persons in an academic environment. It is uncontested that Carey's scholastic aptitude test scores indicate that he almost certainly will be accepted into Gallaudet College (a college for the deaf) where he intends to major in computer science. Finger spelling is necessary to master the technical vocabulary used in that profession. Additionally, the finger impairment hampers the speed with which he can use the computer keyboard and a telephone device for the deaf (T.D.D.) both of which require typing skills.
Carey must continuously repeat himself when spelling with the right hand. He is able to spell with the left hand, however, he is not as adept with the left hand and becomes frustrated when he cannot spell as rapidly as he is accustomed to spelling.
Mrs. Virginia Boles, Carey's tenth grade teacher at the Louisiana School for the Deaf and accepted by the court as an expert interpreter, testified that in the classroom she was frequently unable to understand Carey and often requested that he repeat himself. She also observed Carey's distress and frustration with his communication problems. In her opinion, his communication impediment is considered a stigma to deaf persons.
Carey was awarded damages in the sum of $40,000 for pain and suffering; $60,000 for disfigurement; and $85,000 for emotional distress. The initial inquiry in a general damages award "must always be directed at whether the trier court's award for the particular injuries and their effects upon this particular injured person is, a clear abuse of the trier of fact's `much discretion.'" Reck v. Stevens, 373 So.2d 498, 501 (La.1979). A resort to prior awards is inappropriate absent an abuse of the trier of fact's discretion. Id. at 501.
After reviewing the record and in light of the above discussion of the nature of the injury and its unique effect on Carey, we are unable to determine that this trier of fact abused its discretion to this particular plaintiff. Accordingly, we will not disturb the award.
The judgment of the trial court is affirmed in part and reversed in part. Costs in the amount of $1,961.90 are assessed equally against the state and Horace Mann.
AFFIRMED IN PART, REVERSED IN PART AND RENDERED.
NOTES
[1] Obviously we would not reach this question if Burke were not insured since the state's obligation to reimburse Burke would offset its right to indemnity from Burke.