686 So.2d 969 (1996)
Charles WARREN
v.
Warren CAMPAGNA, Gulf States Marine Terminal, Inc., et al.
No. 96-CA-0834.
Court of Appeal of Louisiana, Fourth Circuit.
December 27, 1996.
*972 Richard L. Root, Betsy J. Barnes, New Orleans, for Appellee.
Jan P. Jumonville, Metairie, for Appellant.
Before BARRY and LOBRANO, JJ., and JAMES C. GULOTTA, J. Pro Tem.
LOBRANO, Judge.
This appeal arises from a judgment in favor of plaintiff, Charles Warren and against defendant, Gulf States Marine Terminal for injuries Warren sustained when he collided with the rear of a trailer owned by Gulf States.

FACTS AND PROCEDURAL HISTORY:
On February 17, 1990, Warren Campagna, owner of Campagna Fiberglass Skiff Corporation, left Gulf States Marine Terminal, driving his truck, but towing a low-boy trailer owned by Gulf States. The trailer was carrying a steel container also owned by Gulf States. The container, 10 feet long, 7 feet high and 7 feet wide, had been loaded upon the trailer by employees of Gulf States. The trailer had no brake lights, no turn signals, no tail lights and no reflective markers. Gulf States loaned the trailer to Campagna because Campagna did not have a trailer large enough to haul the container to his shop where he was going to fiberglass it.
Campagna proceeded down St. Bernard Highway toward Jacob Drive. He began decelerating in anticipation of turning left, when he heard the screeching of brakes. When he looked behind him, he observed a motorcycle, a male and a female all lying in the street. The male was plaintiff, Charles Warren. Warren had catapulted off his motorcycle and struck the rear of the trailer. Medical assistance was summoned for Warren and his female companion, Misty Williams.
On February 11, 1991, Warren filed the instant suit against Gulf States, Warren Campagna, Campagna Fiberglass Skiff Corporation and CNA Insurance Company, the liability insurer of Gulf States and Campagna. Warren alleged that defendants were liable for his injuries pursuant to theories of strict liability and negligence.
Gulf States third partied Campagna asserting that his negligence was the proximate cause or at least, a contributing cause of the accident. Campagna answered alleging that Warren's own negligence in driving in a reckless manner speeding and driving under the influence of alcohol, was the proximate cause of the accident.
The case proceeded to trial on April 21 and 22, 1995. On the first morning of trial, plaintiff dismissed Campagna. Following trial on the merits, the jury, in response to the interrogatories submitted, found that Gulf States was the owner and had custody of the trailer at the time of the accident, but that the trailer was not defective. The jury further found, however, that Gulf States was negligent and was a proximate cause of the accident. Fault was apportioned at 20% to Gulf States, 50% to plaintiff and 30% to others (presumably Campagna). The jury awarded total damages of $405,000.00, including past, present and future medical expenses of $200,000.00, loss of earning capacity of $50,000.00, physical pain and suffering of $25,000.00 and mental anguish in the amount of $30,000.00.[1] *973 Gulf States perfected this suspensive appeal asserting the following assignments of error:
1) The jury erred in finding it negligent after finding the trailer was not defective;
2) The jury erred in finding Charles Warren only 50% negligent;
3) The jury erred in awarding past and future medical expenses of $200,000.00;
4) The jury erred in awarding lost income of $50,000.00.
Charles Warren answers the appeal asserting the following assignments of error:
5) The jury erred in awarding only $25,000.00 for physical pain and suffering;
6) The jury erred in awarding only $30,000.00 for mental anguish;
7) The jury erred in failing to find the trailer unreasonably dangerous and defective;
8) The jury erred in the allocation of fault among the parties.
The errors asserted by both parties present the issues of fault and damages for our review. In order to do so, it is necessary to first summarize the testimony and evidence presented at trial.
Walter Boasso testified that he is the owner and president of Gulf States Marine Terminal. He stated his company sells marine transportation and shipping equipment. The trailer that was involved in the accident was owned by his company. He testified that the container which was on the trailer was also owned by his company. The customer who was going to purchase the container requested that the inside of it be fiberglassed.
Warren Campagna's company was chosen to perform that work. Boasso stated that Campagna picked up the container the morning of the accident to transport it to his shop in St. Bernard Parish. The container was loaded on the 20 foot low boy trailer by Gulf States' employees and then hitched to Campagna's truck. Boasso stated the trailer was not equipped with rear brake lights or turn signals.
On recall, Boasso testified that he did not charge Campagna for use of the trailer. He stated he purchased the trailer at the same time he purchased some containers and that Campagna's use of the trailer was the first time it had been used since its purchase.
On cross examination he testified that he did remember a conversation he had with Campagna regarding the lack of lights on the rear of the trailer.
Warren Campagna testified that he owns Campagna Fiberglass Skiff Corporation, and that his company manufacturers fiberglass boats and other fiberglass fabrications. He stated that on the morning of the accident he arrived at Gulf States Marine to pick up a steel container measuring 7 feet in width, 7 feet in height and 10 feet in length. He was to transport the container to his shop and fiberglass the inside.
He testified that the trailer he used belonged to Gulf States Marine and that they loaned it to him because he had no way to transport the container. Gulf States' employees loaded the container on the trailer and hitched it to his truck. He stated he checked to make sure the safety chain was secure. Campagna testified that he had pulled similar trailers in the past.
Campagna testified that he was travelling east on St. Bernard Highway at approximately 30 mph. When he was approximately 150 feet from Jacob Drive, where he was going to turn left, he began to decelerate using the weight of the trailer to slow down. When he was within 70 feet of the turn, he heard a screeching sound. He looked back and saw a motorcycle lying in the street. On one side he saw a male subject and on the other side, a female, both lying in the street. He stated he did not feel or hear the impact. However, he observed blood on the rear of the trailer. He testified that plaintiff was badly injured. He held his head up until help arrived because plaintiff was choking on his own blood.
When the police arrived, Campagna stated he was given a citation for not having lights on the rear of the trailer. He stated that had he known that he was in violation of the law, he would not have driven with that trailer.
He testified that his rate of speed at the time of impact was 15 mph. He had his *974 truck turn signals on and his arm out indicating he was going to turn. He described the trailer as approximately 8 feet wide, which is about the width of the truck.
On recall, Campagna testified that his lights were on and his emergency flashers were on. The rear markers on his fenders were also turned on. He testified that these rear fender markers can be seen from behind the truck because the fenders stick out beyond the width of the trailer which was lower than the fenders.
He testified that at the time of impact, the truck and trailer were closer to the shoulder of the road than to the center line. He stated that he could not say for sure if the emergency flashers could be seen from behind because they are closer in than the fender lights.
On cross examination he testified that no one at Gulf States Marine told him the trailer had no lights. On re-direct, however, he admitted he didn't object to the trailer having no lights because he believed it was safe to transport it.
Charles Warren, the plaintiff, testified that he has been employed in the construction industry since leaving high school. Although he has done different types of construction work, his expertise is in carpentry. He was a member of the carpenter's union and earned between $11.07 and $15.31 per hour. Prior to the accident, Warren was employed hanging sheetrock for $10.00 per hour. At the time of the accident Warren was 34 years old.
Warren stated that he had been driving motorcycles since he was 9 years old. Previous to this accident, he sustained a broken knee in a motorcycle related accident. He testified that he was thoroughly familiar with motorcycles and was president of a local motorcycle organization called ABATE which engaged in road trips and charity functions. He had to quit the organization following the accident because the demands were too great.
Warren described motorcycles as accelerating faster than cars and stopping quicker than cars specially on dry cement. He testified that you always make a motorcycle loud so that motorists can hear them on the road. He explained that visibility is better on a motorcycle.
Warren testified that on the day of the accident, he left home at around 7:30 a.m. He drove his motorcycle to the French Quarter to check out the Mardi Gras crowd. While there, he met a girl named Misty who needed a ride back to Chalmette. He and Misty left New Orleans around 9:30 and drove to Graffi's Bar in Chalmette to eat crawfish. While there, Warren stated he ate crawfish, potatoes and corn and consumed no more than two beers. He and Misty left Graffi's Bar around 11:00 a.m. to drive to his cousin's home in Poydras, Louisiana. He headed down St. Bernard Highway. When he arrived in the area of Jacob Street, he noticed a trailer stopped in front of him and realized he was too close. He testified that "If I can't lay the bike down I am going to hit the trailer." He then stated he locked his brakes. After that he doesn't remember what happened. He testified he was catapulted off the bike and hit the back of the trailer. When he saw his bike again several days later, the handle bars were bent, the blinkers were broken and the foot peg was bent.
Warren testified that he remained in the hospital eleven days and was told he probably would never speak again. When he left the hospital, he was only able to consume liquids and his leg was in considerable pain and continues to hurt everyday.
Warren testified that he lost twenty-one teeth. He wears false teeth but cannot eat certain foods like apples and corn on the cob. He testified that he tried to work but was unable to do so. Sometimes he would earn $10.00 driving a pick up truck for some roofers. He admitted that he occasionally makes leather belts, wallets and other leather goods. He also admitted that before the accident he was paid "under the table". He also admitted using marijuana and admitted to lying in his deposition because he was scared.
Warren testified that he remembers drinking two beers. He admitted that he knows *975 what it is like to be drunk and that he did not feel intoxicated.
Warren stated that after the motorcycle accident in February, 1990, he was involved in another accident while riding in the rear of an automobile which was rear-ended. He sought chiropractic treatment for back pain. Warren admitted his complaints relating to the motorcycle accident were only to his leg and face. Neither his neck, back or arms were injured.
Warren admitted that he knew it was against the law to pass a car on the white line between oncoming traffic and he admitted exceeding the speed limit by five to ten miles per hour. He admitted to drinking beer and maybe vodka as well the night prior to the accident and that he used cocaine and marijuana in the past.
Royce J. Guillory testified that on the day of the accident, he was a deputy sheriff with the St. Bernard Parish Sheriff's Office. He was assigned to the Field Operations Bureau. His duties included regular patrols including accident investigation. Guillory was approximately four or five blocks from the accident scene when he was notified by radio.
When he arrived at the scene, he observed a trailer hitched to a pick up truck. A motorcycle was lying in the right lane. A male subject was on the ground to the right. A female subject was lying to the left. Guillory observed several people aiding plaintiff who was choking on his own fluids. It was obvious that the female had a broken leg, as well as upper torso and shoulder injuries.
He testified that his report listed several eyewitnesses, one of whom was Muriel Brodie. She related to him that she was travelling on the St. Bernard Highway when plaintiff passed her at a high rate of speed before striking the trailer.
Guillory described the road as having no defects and that the weather was dry and sunny. He observed skidmarks of 70 to 80 feet. The distance the motorcycle travelled after the impact was 61 feet. Campagna told him that he was travelling at 15 mph at the time of the accident.
Guillory stated that there were no obstructions in the road that could obstruct someone seeing a vehicle in front of them. Guillory testified that it took plaintiff only a few seconds to make the 78 feet of skidmarks.
Muriel B. Brodie,[2] was an eyewitness to the accident on February 17, 1990. She was en route to her home in Violet, Louisiana. She described the weather as clear and stated she was driving the speed limit.
She testified that she first saw plaintiff when he passed her at an "extremely high rate of speed". She stated he passed her on the center line between traffic which was going in the opposition direction. When he passed, she turned to her friend and said, "I hope that son-of-a-bitch gets where he's going." Before she could finish her statement, the accident happened.
She was unable to say whether plaintiff took any evasive action or whether the truck was moving at the time of impact. However, she testified that she was able to come to a normal stop after seeing the accident happen in front of her.

MEDICAL EVIDENCE:
Dr. Maynard Ernest Garrett testified that he first saw plaintiff in the emergency room on February 17, 1990. Plaintiff was experiencing severe respiratory distress from a crushed neck and trachea. He also had a compound fracture of the jaw and a severe lower lip laceration. Plaintiff was unconscious. Dr. Garrett performed a tracheotomy to ventilate plaintiff's lungs. Plaintiff was then taken into surgery where Dr. Garrett assisted Dr. Daniel Buras, an oral surgeon, who repaired plaintiff's jaw and lip.
Dr. Garrett saw plaintiff everyday after surgery. By the eighth day, plaintiff's voice box was in a good position and the swelling was down. The tracheotomy tube was removed.
He next saw plaintiff on March 19, 1990. His wounds were healing. He had good vocal cord mobility. Plaintiff complained of pain and was prescribed medication.
*976 On October 11, 1990, Dr. Garrett saw plaintiff for the last time. His neck and face wounds had healed completely. Plaintiff was discharged. He was told to come back if he experienced any additional problems.
Dr. Raul Diaz was recognized as an expert in orthopedic medicine. He testified that he first saw plaintiff on February 17, 1990 in the emergency room of Chalmette Medical Center. Plaintiff was suffering from multiple injuries to the face and lower extremities. Dr. Diaz was only able to splint plaintiff's left leg because he was being prepared for emergency surgery.
Dr. Diaz performed extensive orthopedic surgery on plaintiff several days later on February 21, 1990. Plaintiff's knee cap was cracked in several pieces. He also had multiple cracks of the lower leg. Dr. Diaz removed part of plaintiff's knee cap. He also inserted a metal rod into the leg.
After plaintiff's discharge, Dr. Diaz saw plaintiff on March 22, 1990. At that time, plaintiff had a large ulcer on his leg with infection which Dr. Diaz cleaned. Dr. Diaz stated that the ulcer was caused by severe trauma to the skin.
On April 5, 1990, because the ulcer was not healing properly, Dr. Diaz applied a material called Scarlet Red which speeds healing. Plaintiff was also started on physical therapy for his leg injuries. Dr. Diaz stated that plaintiff was unable to work at that time.
On April 17, 1990, the ulcer displayed some healing but there was little change. On May 2, 1990, Dr. Diaz performed skin grafts on plaintiff's leg at De La Ronde Hospital. On May 10, 1990, an examination revealed that only half of the skin graft was healing. Examinations on May 17th, 22nd and 29th showed that only the center of the graft was successful. The edges did not take. Dr. Diaz debrided the area to stimulate healing.
By June 5, 1990, the center of the graft had failed. However, the ulcer was somewhat smaller. Dr. Diaz informed plaintiff that he would not attempt another graft but would continue to debride the ulcer and treat it to stimulate healing.
From June 14th to October 16th, 1990, the ulcer continued to heal very slowly. Dr. Diaz continued to debride the area and continued to treat plaintiff with antibiotics. During this period of time, plaintiff began to complain about his left ankle. Plaintiff's leg displayed cracked bone which could still be felt laterally and medically under the skin. Plaintiff was treated by pain medication.
By October 2, 1990, the fracture of the leg was still not healed. Dr. Diaz estimated it would take another five to six months to heal. He opined that the ankle discomfort could be due to degenerative arthritis, secondary to trauma.
By January 31, 1991, the ulcer was 95% healed. Plaintiff still complained of ankle pain and stated his ankle gives way when he walks. Plaintiff explained that he could not afford the ankle scans and refused to go to Charity Hospital. By March 14, 1991, the ulcer was completely healed. Plaintiff continued to suffer with ankle pain from April, 1991 to September 1991. Examination showed no objective findings and plaintiff was continued on pain medication.
During an examination in September, 1991, Dr. Diaz observed that one of the metal screws used to hold the metal rod in place, had begun to back out. Plaintiff's leg bone had not fully healed. Either surgery or electric bone stimulation was needed to speed healing. Dr. Diaz suggested plaintiff go to Charity Hospital as these procedures would be expensive.
On September 16, 1991, Dr. Diaz removed the screw in the emergency room using a puncture incision. By October 10, 1991, the puncture site was healing well. However, plaintiff's leg fracture was healing poorly. Again, Dr. Diaz suggested bone graft surgery or electromagnetic stimulation. Plaintiff told Dr. Diaz that he wanted to wait until he could get medicaid. By November 11, 1991, plaintiff was informed that he would not be receiving medicaid.
Dr. Daniel E. Buras was recognized as an expert in oral and maxillofacial surgery. He first saw plaintiff in the emergency room of Chalmette Hospital the day of the accident. Plaintiff had sustained extensive facial trauma on the left side of his mouth. Multiple bone pieces were imbedded in the muscle *977 segment and the lower and upper jaw were broken in many pieces. In addition, plaintiff had lost numerous teeth and his lyoid and laryngeal bones were fractured. Dr. Buras wired plaintiff's jaw together and closed the soft tissue wounds.
When Dr. Buras saw plaintiff on March 15, 1990 he still had pieces of exposed bone on the right, lower jaw area. There was no infection, but plaintiff was still put on antibiotics to prevent infection.
On July 30, 1990 Dr. Buras removed plaintiff's lower right cuspid because it was loose. On September 17, 1990, an area of bone in the lower jaw was removed because it had worked its way out.
Dr. Buras testified that he recommended several additional osteotomies to re-set the jaw which had collapsed so that it would be in a better position to allow plaintiff to wear false teeth. Dr. Buras admitted these operations could cost from $10,000.00 to $12,000.00 dollars.
Dr. Monroe Samuels was recognized as an expert in forensic pathology and clinical toxicology. He examined the accident report, the EMS report and the Chalmette Medical Center record.
He testified that he relied on the lab tech's notation which showed that a blood sample was taken from plaintiff at 11:50 a.m., thirty to forty-five minutes after the accident, and it showed a .20% blood alcohol level.[3] Dr. Samuels stated that plasma or serum was used to perform the test which results in a slightly higher reading than a sample using whole blood. Taking this into consideration, Dr. Samuels estimated plaintiff's blood alcohol level at around .17%. Given time for the alcohol to metabolize, he opined plaintiff's level, at the time of the accident, at between.17% and .18%. Dr. Samuels testified that.1% is the legally intoxicated level for driving a motor vehicle or boat.
He stated that a person's performance deteriorates at a blood alcohol level of .05% or, in some people, lower. He gave the example that a 140 pound man who consumes 3 ounces of gin would be impaired and should not drive. He also explained that the increase of impairment does not rise in a "linear fashion". In other words, if at .05% a person is 10% impaired, at .1% they would not be 20% impaired. The person's impairment would be much greater. They would have difficulty knowing that they are in trouble and in taking the appropriate evasive action because information acquisition and reaction time is slowed. At .17%, the person is "significantly impaired". At .15% the impairment is essentially the same.
Dr. Courtney J. Stroebel, Jr. testified that he is a chiropractor who first saw plaintiff on November 26, 1991. Plaintiff complained of back pain, neck pain and headaches experienced after an automobile accident on November 24, 1991. Plaintiff told Dr. Stroebel that he was a passenger in the rear of an automobile that was rear-ended. Plaintiff did not complain of leg pain or face pain.
On December 5, 1991, plaintiff told Dr. Stroebel that he had done some carpentry. On January 14, 1992, plaintiff told Dr. Stroebel that he "had been working a lot of jobs lately". Two days later, on January 16, 1992, plaintiff told Dr. Stroebel that he had been putting a floor down. On January 23, 1992, plaintiff stated that his back felt better since he finished the floor. On January 28, 1992, plaintiff stated that while lifting a boat motor he pulled his back.
Dr. Stroebel testified that plaintiff had no neck and back complaints from the motorcycle accident.

STANDARD OF APPELLATE REVIEW:
It is axiomatic that an appellate court may not disturb a jury's findings unless they are clearly wrong or manifestly erroneous. Ferrell v. Fireman's Fund Insurance Co., 94-1252 (La.2/20/95), 650 So.2d 742.
"When findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's *978 understanding and belief in what is said." Rosell v. ESCO, 549 So.2d 840, 844 (La.1989).

ASSIGNMENTS OF ERROR 1 AND 7:
Gulf States asserts the jury committed manifest error in finding it negligent after finding that the trailer was not defective. Specifically, Gulf States argues that plaintiff failed to prove that the absence of brake lights, rear lights, reflectors or warning signals, was the proximate cause of the accident or that Gulf States was negligent in failing to exercise control over Campagna when he left with the trailer or that Gulf States negligently entrusted the trailer to Campagna, an allegedly careless or reckless driver.
Plaintiff counters with the argument that Gulf States knew the trailer was not equipped for use on the public roads and was negligent in allowing Campagna to use it. By way of its appellate answer plaintiff also asserts that it was error for the jury not to find the trailer defective and hold Gulf States strictly liable pursuant to Louisiana Civil Code article 2317.
Initially, we review the law with respect to both the negligence and article 2317 claims.

NEGLIGENCE:
Generally, negligence is defined as conduct which falls below the standard established by law for the protection of others against an unreasonable risk of harm. Dobson v. Louisiana Power and Light Company, 567 So.2d 569 (La.1990). A particular unforeseeable risk may be included within the scope of a duty if the injury is easily associated with the rule relied on and with other risks of the same type that are foreseeable and clearly within the ambit of protection. Hebert v. Taco Bell Corp., 613 So.2d 729, 732 (La.App. 4th Cir.1993), citing Forest v. State, thru La. Dept. of Transportation, 493 So.2d 563 (La.1986).
In negligence cases, the reviewing court must consider the ease with which it can associate the duty owed and the risk encountered, whether the breached duty was a substantial cause and whether the risk is reasonably foreseeable. See, Sibley v. Gifford Hill and Co. Inc., 475 So.2d 315 (La. 1985); Dunne v. Orleans Parish School Board, 463 So.2d 1267 (La.1985). Furthermore, whether a legal duty is owed by one party to another depends upon the facts and circumstances of the case and relationship of the parties. Seals v. Morris, 410 So.2d 715 (La.1981). Simply put, under a duty risk analysis the liability of Gulf States must be grounded on the breach of a duty owed to plaintiff that is a proximate cause of plaintiff's injuries.

ARTICLE 2317 LIABILITY:
At the time of the accident, Louisiana Civil Code Article 2317 provided:[4]
We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody.
In seeking recovery under Article 2317, the plaintiff bears the burden of proving (1) the thing which caused the damage was in the care, custody and control of the defendant; (2) the thing had a vice or defect which created an unreasonable risk of harm; and (3) the injuries were caused by a defect. Loescher v. Parr, 324 So.2d 441 (La.1975).[5]
*979 The imposition of article 2317 liability is predicated on a person's custody or garde of a defective thing which creates an unreasonable risk of injury to others. King v. Louviere, 543 So.2d 1327 (La.1989). The guardian is in a better position than an innocent victim to detect, evaluate and take steps to eliminate the unreasonable risk of harm arising in a defective thing. Ross v. La Coste de Monterville, 502 So.2d 1026 (La.1987). "An owner who transfers to another possession of his thing containing a structural defect continues to have the garde or custody of its structure and a duty to protect others from harm caused by the defect." Id. at 1029. A defective thing poses an unreasonable risk of harm if its social utility is outweighed by the danger it poses to others. See, Landry v. State, 495 So.2d 1284 (La. 1986). Finally, a plaintiff's comparative fault is a defense in article 2317strict liability cases. Id. at 1289-1290.

ANALYSIS:
Applying the above principles to the facts of this case we find that the jury's conclusion that Gulf States was negligent is supported by the record. However, we also conclude that the jury was clearly wrong in finding that the trailer was not defective. We hold that Gulf States is also liable under article 2317.
The jury correctly concluded that Gulf States had custody (garde) of the trailer at the time of the accident. Walter Boasso, owner of Gulf States, testified that Gulf States owned the trailer and that the trailer was on Gulf States' premises when Campagna arrived to pick up the container. After Gulf States and Campagna entered into the contract to fiberglass the container, Gulf States allowed Campagna to use the trailer only for the purpose of transporting the container to his shop to complete the contract. Campagna testified that he did not own a trailer large enough to transport the container. Gulf States then offered Campagna the temporary, limited use of the trailer to transport the container, which was also owned by Gulf States. Gulf States employees hitched the trailer to Campagna's truck and loaded the container onto the trailer. See, Ross v. La Coste de Monterville, supra, where it was held that owner still had garde after the defective thing was borrowed by another.
The jury was manifestly incorrect, however, in finding that the trailer was not defective. The recognition of the potential danger to following motorists of trailers not equipped with rear warning devices is embodied in Louisiana Revised Statutes 32:306(B) and 308(B). These statutes mandate that a trailer this size,[6] when operated on the highways of this state, must be equipped with electrical turn signals, two front clearance lamps, one at each side, a minimum of two rear clearances lamps, one at each side, two side marker lamps on each side and, two reflectors one of each at or near the front and at or near the rear. It is not unreasonable to assume that a following motorist would rely on these devices in determining if the driver towing the trailer is in the process of stopping, turning or some other potentially dangerous maneuver.
The lack of these warning devices, therefore, constitutes a defect which is unreasonably dangerous. The possibility of harm is apparent and obvious. A following motorist could easily be fooled into a false sense of security until it was too late to take successful evasive action. At trial, plaintiff testified that he did not realize that Campagna was slowing down to turn until he was too close to evade a collision. There is no doubt that the harm posed by the defective trailer outweighs its utility. It would have been relatively simple to install the proper signals.
Gulf States, as guardian, was in a better position than the plaintiff, to detect the defect, and take steps to eliminate the unreasonable risk of harm it posed. This is evidenced by the fact that Gulf States knew a day in advance that Campagna was going to use the trailer to transport the container. It had the time to either install the proper warning devices or use another method to transport the container.
*980 The record also supports Gulf States' negligence.[7]
Gulf States' duty to equip the trailer with rear warning devices is mandated by law. LSA R.S. 32:306(B) and 308(B). Gulf States' failure to meet those safety requirements constituted a breach of that duty and was a substantial cause of plaintiff's injuries. The scope of the duty to properly equip the trailer with rear warning devices encompasses the kind of risk (that a following motorist may fail to see what he should see) encountered by plaintiff, is reasonably foreseeable and clearly within the ambit of protection afforded by the law.
Furthermore, the risk encountered, i.e. a rear-end collision, and the subsequent injuries sustained, are easily associated with Gulf States' failure to properly equip the trailer before allowing it to be used on the public roads.
Gulf States' argument that it could not be negligent because plaintiff failed to prove that Gulf States exercised control over Campagna after he left with the trailer is without merit. Gulf States' negligence is founded in its breach of the duty to properly equip the trailer with rear warning devices and allowing its use on the public roads. Its negligence is not grounded in any subsequent control or lack thereof after Campagna drove off the premises. Gulf States could have and should have prevented the use of their defective trailer on the public highways.
Gulf States further argues that the lack of brake lights was not a proximate cause of the accident and is irrelevant as a cause of the accident because Campagna did not use the brakes to slow his speed. Campagna testified that he let up on the gas and allowed the weight of the trailer to slow his speed. Nevertheless, while this argument may have some merit, brake lights were not the only warning device that the trailer was lacking which could have alerted plaintiff. Campagna was slowing in anticipation of turning left. The trailer was required to have turn signals. It did not. Therefore, it is not unreasonable to conclude that even in the absence of brake lights, plaintiff still could have been alerted that the trailer was slowing by the use of the properly required turn signals.
Furthermore, Gulf States' defense that given plaintiff's speed and intoxicated condition, the accident would have happened even if the trailer had been properly equipped goes to the weight of the evidence of plaintiff's own negligence and comparative fault. It does not negate Gulf States' negligence.
We therefore find no manifest error in finding Gulf States negligence was a proximate cause of the accident.

ASSIGNMENTS OF ERROR 2 AND 8:
Gulf States asserts the jury erred in finding plaintiff only 50% at fault. Gulf States argues that the lack of lights on the rear of the trailer was not the proximate cause of the accident, but rather plaintiff's own negligence in failing to see the trailer due to his excessive speed and intoxicated condition caused his injuries.
Plaintiff counters by asserting that the allocation of fault amongst the parties is not supported by the record. He argues, however, that the record supports a finding that his fault should not exceed twenty percent (20%); Campagna's fault (other) should not exceed twenty percent (20%) and that Gulf States' fault should be at least sixty percent (60%). Plaintiff bases his argument on the fact that Gulf States owned the defective trailer and allowed Campagna to use it on the public roads knowing of the defect. He also argues that passing at a rapid speed is proper when operating a motorcycle and was not a cause of the accident.
The trier of fact is owed great deference in its allocation of fault and may not be reversed unless clearly wrong. Clement v. Frey, 95-1119, 95-1163 (La.1/16/96), 666 So.2d 607, 610. A reviewing court may reallocate fault only after it has found an abuse of discretion and then, only to the extent of lowering or raising the percentage of fault to the highest or lowest point. Clement, at p. 5, 666 So.2d at 609.
In Watson v. State Farm Fire and Casualty Ins. Co., 469 So.2d 967, 974 (La.1985), the Supreme Court set forth five factors which *981 may influence the degree of fault assigned: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought.
After consideration of the evidence summarized supra, we find no manifest error in the allocation of fault.
Gulf States must bear some responsibility for allowing Campagna to use the defective trailer on the public highways with full knowledge of the trailer's deficiencies. That responsibility is also grounded on their garde of the defective trailer. Their 20% fault allocation, whether based on negligence or article 2317 is not clearly wrong.
Although Campagna testified that he was unaware of the defect in the trailer, Boasso testified that he warned Campagna to be careful because the trailer had no lights. Campagna testified that he used his outstretched arm to signal the left turn, an indication that he was fully aware that the trailer was not properly equipped with turn signals. Furthermore, even though Campagna testified that he had the headlights, safety flashers and rear marker lights of his truck on, nothing in the record, except Campagna's own self serving testimony, indicates that these signals were visible to following motorists given the size of the trailer and the container he was towing. Also, there is nothing in the record that indicates that Campagna was forced to use the trailer. He always had the option of declining the offer. Thus, we cannot say that the jury abused its discretion in holding Campagna to a higher degree of fault than Gulf States.
In arguing an abuse of discretion in the assessment of his own fault, plaintiff incorrectly argues that the only negligence which can be attributable to him is exceeding the speed limit.
Several factors contributed to plaintiff's own negligence.
Plaintiff was legally intoxicated. Dr. Samuels testified that plaintiff's blood alcohol level, at the time of the accident, was .17% to.18%. Dr. Samuels further testified that performance deteriorates beginning with a blood alcohol level of .05% and with some individuals, even lower. Plaintiff offered no contradictory evidence other than his cross-examination of Dr. Samuels wherein a discrepancy in the time the blood was drawn was noted. The jury was aware of, and considered this testimony.
Furthermore, plaintiff's actions showed utter disregard for the safety of himself and others. Plaintiff was riding the center line with vehicles going in different directions. He admitted he was exceeding the speed limit. Muriel Brodie testified that plaintiff was travelling at a high rate of speed when he passed her.
We have no way of knowing the jury's thought process in allocating fault. However, it is not unreasonable to believe the jury concluded that plaintiff should have been able to react sooner and quicker, thus avoiding the accident, had he not been intoxicated and/or speeding. The preponderance of the evidence fully supports a finding that Campagna and plaintiff should bear the greater share of the fault in causing the accident. The record does not support Gulf States' argument that plaintiff was one hundred percent (100%) at fault.

ASSIGNMENTS OF ERROR 3, 4, 5 AND 6:
In these assignments of error, Gulf States asserts it was error for the jury to award $200,000.00 for past and future medical expenses and $50,000.00 for lost income. Plaintiff asserts it was error for the jury to award only $25,000.00 for physical pain and suffering and $30,000.00 for mental anguish.
Before a damage award may be set aside as inadequate or excessive, the reviewing court must look first, not to prior awards, but to individual circumstances of the instant matter before it. Only after an analysis of the facts and circumstances peculiar to the instant case can a reviewing court determine if the award is an abuse of the trial court's discretion. Once it is determined *982 that there was an abuse of discretion, the appellate court then may disturb the award by raising it to its lowest reasonable level. Reck v. Stevens, 373 So.2d 498 (La. 1979). "It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award." Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993).
The test for determining the causal relationship between an accident and subsequent medical treatment is whether the medical testimony proves that it was more probable than not that the subsequent medical treatment was necessitated by trauma suffered in the accident. Mart v. Hill, 505 So.2d 1120 (La.1987). A claimant is entitled to compensation for future medical treatment if it is proven by a preponderance of the evidence that the future treatment is a result of the injuries sustained in the accident. See, Jordan v. Travelers Insurance Company, 257 La. 995, 245 So.2d 151 (1971).
The jury itemized its damage award as follows:

Physical pain and suffering (Past and
future) $ 25,000.00
Mental anguish (past and future) 30,000.00
Permanent disability 100,000.00
Medical expenses (past and future) 200,000.00
Loss of earnings and/or earnings capacity,
if any 50,000.00
 ___________
Total $405,000.00

At trial the parties stipulated to past medical expenses of $79,081.55. Gulf States suggests that the only future medical expenses proved by plaintiff was the osteotomy referred to by Dr. Buras. Dr. Buras estimated the surgery to cost between $10,000.00 and $12,000.00. Thus Gulf States asserts that plaintiff's past and future medical cost should not have exceeded $89,081.55 to $91,081.55. After a review of the record, we cannot say that plaintiff's future expenses are limited only to the cost of a single osteotomy.
Dr. Buras opined that plaintiff would require at least three osteotomies which would involve costs for three surgeries and three hospital stays. Dr. Diaz testified that plaintiff's leg fracture was not healing properly. He suggested that plaintiff may still require bone grafts or electromagnetic stimulation. He testified that both of these procedures are expensive. The bone graft requires surgery and costs for hospital stays and all costs incidental to surgery.
Dr. Harry Hoerner,[8] an orthopedist, diagnosed plaintiff as suffering with a post op open fracture of the left tibia and fibula with rod placement. Dr. Hoerner found delayed union of the mid shaft of the tibia. Dr. Hoerner's diagnosis supports Dr. Diaz's diagnosis that future surgery on plaintiff's leg may be necessary. Dr. Frederick Keppel,[9] an orthopedist, also found a large bony defect over the tibial surface. He opined that plaintiff is at risk for future breakage of the rod and possible re-fracture of the tibia.
Assuming the cost of a minimum of three osteotomies to be $36,000.00 ($12,000.00 each), plus the cost of three hospital stays, plus the possibility of future bone grafts, it is not an abuse of discretion for the jury to award an additional $120,000.00 for future medical expenses.
The record also supports the jury award for loss of earning capacity. Plaintiff testified that prior to the accident he was a union carpenter capable of earning from $11.07 to $15.31 per hour. At the time of the accident he was installing sheetrock at $10.00 per hour. After the accident, plaintiff stated he was forced to resign from the union because no one would hire him because of the risk involved. He admitted to working odd jobs whenever he could find them and was paid "under the table". Both Dr. Hoerner and Dr. Keppel in their reports found plaintiff disabled. Both restricted plaintiff from construction work suggesting only sedentary work. The record also indicates that plaintiff is functionally illiterate and only qualified to perform manual labor. We cannot say that *983 the jury's award of $50,000.00 for loss of earning capacity was error.
Plaintiff asserts the jury erred in only awarding $25,000.00 for physical pain and suffering and $30,000.00 for mental anguish. We agree. Considering plaintiff's extensive and severe injuries to his face, neck, leg and knee, we are convinced that the jury abused its discretion in its award for pain and suffering.
The medical testimony and evidence reveals that plaintiff sustained a crushed neck and trachea resulting in severe damage to his voice box and respiratory system requiring an emergency tracheotomy to relieve respiratory distress; multiple fractures and breaks to his jaw resulting in the loss of numerous teeth as well as loss of bone; and, a severe lower lip laceration.
Surgery was required to repair the jaw and lip with a good possibility that future surgeries will be needed to realign plaintiff's jaw. Plaintiff's face and neck injuries took approximately eight months to heal.
Plaintiff also sustained extensive injuries to his left leg and knee. Plaintiff underwent extensive orthopedic surgery to repair multiple fractures to his knee cap and multiple breaks to his lower leg requiring removal of part of the knee cap and the insertion of a metal rod into his leg.
An ulcer also formed on his left leg as a result of severe trauma. This ulcer resisted normal healing and required a skin graft operation which only partially succeeded. The leg ulcer took over one year to heal.
Plaintiff's leg fracture was still not healed by September, 1991, nineteen months from the date of the accident. Examination revealed one of the metal screws had backed out of the bone. The screw had to be removed. As of the date of trial, plaintiff still was experiencing ankle and leg discomfort.
Having determined there was an abuse of discretion in the award, we consider for guidance purposes, other cases where similar injuries were sustained.
In Ledet v. Burgess, 93-600 (La.App. 5th Cir. 2/9/94), 632 So.2d 1185, plaintiff was awarded $30,000.00 in general damages for fractures of the facial bones consisting of a left nasal bone depression, a right nasal septal deformity, a left cheek bone depression and bleeding around the eyeball after being attacked by another man. An open reduction and internal fixation of the left trimalleolar fracture, septoplasty and right nasal osteotomy were performed. Plaintiff experienced a great deal of pain before and after the surgery. He experienced numbness to part of his face.
In Delphen v. DOTD, 94-1261 (La.App. 4th Cir. 5/24/95), 657 So.2d 328, writ denied 95-2116 (La.11/17/95), 663 So.2d 716; 95-2124 (La.11/17/95), 663 So.2d 717, plaintiff was awarded $150,000.00 for past and future pain and suffering and $50,000.00 for past and future mental anguish. While operating a bicycle, plaintiff was thrown from the bike striking his face on the roadway. The accident was caused when plaintiff's bike encountered a 2 to 4 inch elevation in the surface of a drawbridge. Plaintiff required seven facial surgeries including a tracheotomy, various repairs to his shattered nose, and repair to his fractured right eye socket. Plaintiff's jaw was wired shut and he underwent surgeries involving orthodontic care. He also required treatment of TMJ. He also had major depression associated with the accident. He underwent nine months of psychotherapy, endured years of physical and emotional pain, had trouble maintaining a job, and trouble with his marriage. He had some facial scarring and was hospitalized six to nine days.
In Clement v. Griffin, 91-1664, 92-1001, 93-0591 to 0597 and 93-0648, (La.App. 4th Cir. 3/3/94), 634 So.2d 412, writ denied 94-0717 (La.5/20/94), 637 So.2d 478; 94-0777 (La.5/20/94), 637 So.2d 478, 94-0789 (La.5/20/94), 637 So.2d 478, 94-0791 (La.5/20/94), 637 So.2d 479, plaintiff's $340,000.00 award was reduced to $200,000.00. There plaintiff's injuries consisted of numerous facial lacerations, a neck laceration, a laceration to the left ear, and a laceration of the jaw bone as a result of a van accident when the right rear tire blew out causing the van to flip several times. The laceration on the jaw exposed the jaw bone. Plaintiff also sustained a fractured/crushed vertebra of the *984 neck. Treatment of the neck injury resulted in skin infections and an infected cyst in the lymph node on the side of his jaw.
In Girvan v. New Orleans Public Service, Inc., 94-0681 (La.App. 4th Cir. 11/30/94), 646 So.2d 481, writ denied 94-3169 (La.3/10/95), 650 So.2d 1178, plaintiff was awarded $35,000.00 in general damages. Plaintiff fell into an open manhole. He sustained a fractured tibia and fibula. He underwent six months of active treatment. Plaintiff sustained a permanent impairment of his left leg caused by imperfect alignment of the fractures during the healing process. He has a bump on his leg, and testified that he is unable to engage in activities such as jogging and playing soccer.
In Morse v. New Orleans Steamboat, Co., 580 So.2d 544 (La.App. 4th Cir.1991), plaintiff's original total award of $50,000.00 was increased to $60,000.00 for general damages plus $17,427.10 for past and future medical expenses. Plaintiff suffered a displaced fracture of the femur requiring surgery as a result of a fall. A rod was inserted through the femur. Two and one-half years later, a second operation was necessary to remove the rod. Other injuries consisted of a front incisor which was knocked out requiring repeated root canal procedures.
In Beoh v. Watkins, 93-1394, 93-1395, 93-1396 (La.App. 4th Cir. 11/30/94), 646 So.2d 513, writ denied 94-3155 (La.2/9/95), 649 So.2d 428, plaintiff was awarded $75,000.00 in general damages after sustaining injuries to both legs in an automobile accident. His right leg injury required wire stitches which left a scar. On his left leg, he suffered a gash to his foot and a serious soft tissue injury to his left ankle. This injury required plaintiff to wear a plastic cast for ten days. After the cast was removed, plaintiff used crutches and was not allowed to place weight on the left ankle for three months. He then wore an ankle brace for another three months. He received physical therapy two to three times a week and took medication for pain and swelling during a six month period. He complained again of left knee pain, calf and ankle pain and was actively treated for these problems for another six months. He sustained a 10 percent anatomical disability with a disfiguring scar on his left ankle.
Considering the ranges discussed in the above cases, we conclude that the lowest reasonable award for plaintiff's pain and suffering and mental anguish is $155,000.00.
Accordingly, the judgment of the trial court is amended to increase the general damages (pain and suffering and mental anguish) awarded to Warren from $55,000.00 to $155,000.00. The judgment is also amended to hold Gulf States strictly liable for the defect in the trailer. In all other respects, the judgment is affirmed.
AMENDED AND AS AMENDED; AFFIRMED.
NOTES
[1] In addition, the jury awarded $100,000.00 for permanent disability. However, no one raises any issues with respect to that award.
[2] This witness testified via video deposition.
[3] Plaintiff argues, and brought out during cross examination, that the lab analysis sheet shows that plaintiff's blood was drawn at 1:30 p.m., thus making Dr. Samuels' opinion inconclusive.
[4] Article 2317 was amended and reenacted as Article 2317.1 by Acts 1996, 1st. Ex.Sess., Act 1, Section 1, to read as follows:

Art. 2317.1. Damage caused by ruin, vice, or defect in things
The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. Nothing in this Article shall preclude the court from the application of the doctrine of res ipsa loquitur in an appropriate case.
The above version is a substantive change in the law and cannot be applied retroactively. However, if the issue of knowledge were raised as a defense, the record is clear that Gulf States had knowledge of the lack of lighting on the trailer. Thus, our holding under article 2317 would be the same.
[5] Again we are referring to and citing jurisprudence with respect to article 2317 prior to its amendment in 1996.
[6] The record shows the trailer was large and heavy and at least 20 feet long and 8 feet wide.
[7] Plaintiff agrees that negligent entrustment was not proven.
[8] Dr. Harry Hoerner examined plaintiff on April 4, 1995. His report was admitted into evidence as Defendant's exhibit 2.
[9] Dr. Frederick Keppel examined plaintiff on October 19, 1994. His report was admitted into evidence as Defendant's exhibit 3.